Wat HENRY, Plaintiff in Error,

v.

Henry CLAY and E. E. Clay, Defendants in Error.

No. 35948.

Supreme Court of Oklahoma.

May 25, 1954.

Rehearing Denied July 28, 1954.

Application for Leave to File Second Petition for Rehearing Denied Oct. 10, 1954.

546

Hughey Baker, Tulsa, Young, Young & Young, Sapulpa, for plaintiff in error.

Davenport & Allen, Sapulpa, for defendants in error.

WILLIAMS, Justice.

The parties hereto are referred to herein as they appeared in the trial court.

Plaintiffs, Henry Clay and E. E. Clay, filed their petition herein seeking to quiet their title to a certain oil and gas lease as against the defendant, Wat Henry, who held a prior lease on the same premises.

Defendant leased the premises in question for oil and gas purposes on October 27, 1949. The term of the lease was one year, "and so long thereafter as oil or gas or either of them is produced from said land by lessee". Production was obtained during and after the primary term of the lease. Plaintiffs obtained a lease on the same land on June 20, 1952.

It is plaintiff's position that defendant's lease had expired for want of production in paying quantities.

At the conclusion of the trial, the trial court found that defendant's lease had expired at the termination of the primary term thereof for want of production in paying quantities and rendered judgment for plaintiffs, and defendant appeals.

 This court is committed to the doctrine that when an oil and gas lease provides that it shall remain in force and effect for a certain term and so long thereafter as oil or gas is produced, the term "produced" means produced in paying quantities. The term "paying quantities" in such case means paying quantities to the lessee. If the well pays a profit even though small, over operating expenses, it produces in pay-

ing quantities, though it may never repay its costs, and the operation as a whole may prove unprofitable. Ordinarily the phrase is to be construed with reference to the operator, and by his judgment, when exercised in good faith. Gypsy Oil Co. v. Marsh, 121 Okl. 135, 248 P. 329, 48 A.L.R. 876; Pine v. Webster, 118 Okl. 12, 246 P. 429; Walden v. Potts, 194 Okl. 453, 152 P.2d 923.

In the case at bar, in order that defendant might be vested with a limited estate for further development, it was incumbent upon him to discover oil or gas in paying quantities on or before October 27, 1950, which was the date of expiration of the original term of the lease. This brings us to the question of whether or not oil or gas was discovered in paying quantities before the expiration of the original term of the lease.

The evidence reveals that a well was brought in in February, 1950, and that between that time and October 27, 1950, it produced at least 256.1 barrels of oil which brought a net price, after tax, of $634.68. The defendant operator's 7/8ths of this net would be $555.34. The evidence with respect to the operating cost during this period is somewhat in conflict, but it was shown that a pumper was employed at all times at a cost of $25 per month and that other incidental expenses would run anywhere from $5 to $15 per month. If we accept as correct the maximum amount of expense contended for by plaintiff, or $40 per month, the total operating expense for the 9 month period of February through October, 1950, would only be $360. Since the operator's share of the oil sold during this period was $555.34, it is apparent that there was a net profit over operating expenses to the defendant operator in the amount of $195.34. Oil was therefore discovered and produced in paying quantities prior to the expiration of the original term of the lease, and such lease therefore did not expire under its own terms at the end of the primary term.

Plaintiffs contend that the method used herein to determine whether the production was in paying quantities is fallacious. Suffice it to say, however, that the method suggested by plaintiffs does not take into ac-

count at all the large initial production of the well in question, and the method we have adopted herein is that used and approved by the Federal Court in the well reasoned opinion in the case of Denker v. Mid-Continent Petroleum Corp., 10 Cir., 56 F.2d 725, 84 A.L.R. 756.

■ The finding of the trial court that the lease of the defendant Wat Henry expired at the end of the primary term for non-production is clearly in error, oil having been discovered and produced in paying quantities prior to the expiration of the primary term of the lease. Defendant then became vested with a limited estate in the leased premises for further operations in accordance with the terms of the lease. Such limited estate however is in the nature of a determinable one and exists only so long as oil or gas continues to be produced in paying quantities. Gypsy Oil Co. v. Ponder, 92 Okl. 181, 218 P. 663. It therefore becomes necessary to determine whether oil or gas was still being produced in paying quantities at the time of the institution of this suit on October 17, 1952, since if such production had ceased at any time prior to that date defendant's lease would have expired by its own terms and the judgment of the trial court would be correct, even though it incorrectly determined the date of such expiration. The evidence in this regard is far from satisfactory, but the following facts may be fairly gleaned therefrom. A well was brought in by defendant on the premises in question in February of 1950. When the well came in it flowed strongly with considerable quantities of gas and oil. Such flow continued for only a brief time, however, and the well was then placed on a pump and has been pumped continuously ever since except for brief periods of normal breakdown and repairs. The evidence does not reveal the exact amount of oil and gas produced by this well up to the date this suit was filed. It does reveal that the total amount received for the oil sold to that date was the sum of $1,031.97, of which the defendant's share was 7/8ths of this or $902.97. It also appears that there had been some small amount of oil produced which had not been sold and that although no gas had been sold, sufficient gas was produced to be used by defendant in the drilling of another well. It therefore appears that although we are unable to determine the exact value of defendant's share of the oil and gas produced at the time of the filing of this suit, it would be slightly in excess of the sum of $902.97 actually received by him.

■■ With regard to the total operating cost to the date of filing of this suit, again we are not favored with the exact amount thereof by the evidence adduced at the trial. It definitely appears, however, that the pumper was paid the sum of $25 per month, continuously, and was first employed on or about February 20, 1950. The expense of employing the pumper was therefore approximately $800. It further appears that there were various incidental expenses of operation during the period in question, but the exact amount is not shown. The defendant testified that such expenses totalled the sum of $56 for the year 1951. There is no evidence as to the amount of such expense for the pertinent portion of the years 1950 and 1952, however, except testimony to the effect that defendant had previously stated that such expenses ran from $10 to $15 per month, which was offered as an admission against interest. The expense for the year 1951 of $56 would be an average monthly expense of $4.66. If we accept this monthly average as being fairly representative of the entire period in question and multiply it by the total number of months involved, which is approximately 32, we arrive at a total operating incidental expense of $149.-12, which when added to the pumper's salary, makes a total operating cost of $949.12. This sum is, of course, $46.15 more than the total amount actually received from the sale of oil by the defendant operator. Thus, it might seem that the well had not paid a profit over operating expenses at the time this suit was filed. Such computation, however, does not take in to account the oil produced and on hand but not sold as of that date, nor the value of any gas produced and used. We have no way of determining the amount of these items from the evidence, although it does appear that there were at least 15 barrels of oil on hand but

not sold. Since the difference between the known income and expense is so small and the amount of some pertinent items is unknown, we are not willing to say that the well in question had not paid the defendant operator any profit at all. In the case of Okmulgee Supply Corporation v. Anthis, 189 Okl. 139, 114 P.2d 451, we held that the lessee could remove his equipment from the lease only after the lease could be no longer profitably operated, and that the lease could be profitable when, by the exercise of due diligence and skill, the value of the lessee's part of the oil and gas produced exceeded the cost of operation. We further held that the standard by which the judgment and good faith of the lessee is measured is whether the lease is producing, or by the exercise of reasonable skill and diligence could be made to produce, sufficient oil and gas to justify a reasonable and prudent operator in continuing the operation thereof. It is a poor rule that does not work both ways. Having held that the operator is under a duty to continue production if by the exercise of reasonable skill and diligence the well could be made to produce sufficient oil and gas to justify a reasonable and prudent operator in continuing the operation thereof, we believe the operator should have the right to continue production under the same circumstances. The exact amount and value of oil or gas produced by any well is, of course, purely speculative prior to the actual production and sale thereof. We do not believe that the operator, being under a duty to produce and pay the cost incident thereto from his own pocket, must do so at his further peril of forfeiting his entire investment therein should the total cost of production at any particular time slightly exceed the actual returns to him.

It should also be borne in mind that this is an equitable matter, and we are not impressed with the equities in behalf of plaintiff. The following facts are substantially without contradiction in the record:

1. This is an action between two lessees and the lessors are not parties hereto. The lessors have never made any complaint concerning the operation of the lease by defendant and have never indicated that they considered defendant's lease terminated. Furthermore, one of the lessors has been, and apparently still is, employed by defendant as a pumper on the lease involved, and the lessor owning ⅓rd of the surface rights and living on the premises in question, accepted a check for location damages for the drilling of a second well by defendant as late as December 31, 1952.

2. Plaintiffs took their lease *with notice* that the premises concerned were occupied by defendant in accordance with his lease; they caused inquiry to be made of him as to how much it would take to purchase his lease, but did not pursue their inquiry and made no offer of purchase.

3. Defendant has at all times since production was first obtained during the primary term of his lease been in actual possession of the lease, operating it and producing from it in varying quantities.

4. There was some evidence that at least two of the lessors, at the time they signed plaintiffs' lease, were led to believe or were allowed to believe, that plaintiffs had bought or were buying defendant's interest.

5. Plaintiffs paid no consideration whatsoever, for their leases or extensions thereto, whereas defendant had paid substantial sums to acquire his lease and had further expended substantial sums in drilling, outfitting and treating the well in an effort to obtain paying production.

6. Plaintiffs' verified petition herein alleges that plaintiffs are in possession of the land described therein, and the evidence discloses that plaintiffs were not and had never been in possession of said premises, but that defendant had at all times been in possession thereof.

Under the evidence in this case, we believe the court erred in quieting plaintiffs' title and enjoining defendant from going on the premises involved.

The judgment of the trial court is reversed.

HALLEY, C. J., JOHNSON, V. C. J., and WELCH, CORN, DAVISON, and O'NEAL, JJ., concur.

BLACKBIRD, J., concurs in conclusion.