TRES C v. RAKER RESOURCES
2023 OK 13
Case Number: 118650
Decided: 02/14/2023
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2023 OK 13, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

 

 

TRES C, LLC, Plaintiff/Respondent,
v.
RAKER RESOURCES, LLC; CONTINENTAL RESOURCES, INC.; and DEWBLAINE ENERGY, LLC, Defendants/Petitioners.

ON CERTIORARI FROM 
THE COURT OF CIVIL APPEALS, DIVISION IV

¶0 This appeal concerns the trial court's judgment after a bench trial that granted Plaintiff/Respondent's petition to cancel Defendants/Petitioners' oil and gas lease and to quiet title in its favor so that a third party can exercise the option of executing a new lease. The Court of Civil Appeals conditionally affirmed the trial court's judgment, but remanded the matter with instructions to address the noncontractual defense of obstructions, which is set forth in Jones v. Moore, 1959 OK 23338 P.2d 872de novo review, we find that the trial court did err insofar as it relied upon the lease's cessation-of-production clause to define the time period for assessing profitability. We vacate the Court of Civil Appeals' opinion, reverse the trial court's judgment, quiet title in favor of Defendants/Petitioners, and remand the case for further proceedings not inconsistent with this opinion.

OPINION OF THE COURT OF CIVIL APPEALS VACATED; 
JUDGMENT OF THE DISTRICT COURT REVERSED; 
CASE REMANDED FOR FURTHER PROCEEDINGS 
NOT INCONSISTENT WITH THIS OPINION.

Jana L. Knott, BASS LAW, Oklahoma City, Oklahoma; and Travis P. Brown, Cody J. McPherson, and Scott R. Verplank, MAHAFFEY & GORE, P.C., Oklahoma City, for Plaintiff/Respondent.

Harvey D. Ellis and Andrew E. Henry, CROWE & DUNLEVY, Oklahoma City, Oklahoma, for Defendants/Petitioners.

Jennifer Schnell Kaiser, CONTINENTAL RESOURCES, INC., Oklahoma City, Oklahoma, for Defendant/Petitioner Continental Resources, Inc.

COMBS, J.:

FACTUAL AND PROCEDURAL BACKGROUND

¶1 Plaintiff/Respondent Tres C, LLC (hereinafter "Tres C") is an Oklahoma limited liability company whose members are Viola "Tincy" Cowan, her son David Cowan, her daughter Karlea Cowan Ewald, her grandson Scot Meier, and her granddaughter Marsha Bukowski.

¶2 In February of 1955, George and Carol Cowan, executed an oil and gas lease in favor of J.J. Wright (hereinafter "the Lessee") concerning those mineral interests in Section 35-15N-13W of Blaine County (hereinafter "the Cowan Lease").

If within the primary term of this lease, production on the leased premises shall cease from any cause, this lease shall not terminate provided operations for the drilling of a well shall be commenced before or on the next ensuing rental paying date; or, provided lessee begins or resumes the payment of rentals in the manner and amount hereinbefore provided [in Paragraph 5 of the Cowan Lease]. If, after the expiration of the primary term of this lease, production on the leased premises shall cease from any cause, this lease shall not terminate provided lessee resumes operations for drilling a well within sixty (60) days from such cessation, and this lease shall remain in force during the prosecution of such operations and, if production results therefrom, then as long as production continues.

In 1965 during the primary term of the Cowan Lease, Sun Oil Company (a former successors-in-interest to the Lessee) drilled and completed the G.D. Cowan No. 1 Well (hereinafter "the Cowan Well") into the Morrow formation in the northwest quarter (NW/4) of Section 35-15N-13W.

¶3 Defendants/Petitioners are the Lessee's current successors-in-interest under the Cowan Lease.

¶4 When DMS Oil first acquired the Cowan Well in April of 2009, the well was producing, but at low rates.

¶5 Things continued as normal until early 2016, when Tres C's royalty checks from Raker Resources allegedly began to arrive sporadically.costs and revenue from January 2012 to the current date . . . . in their native format as they are kept in the normal course of business within 45 days of your receipt of this letter."

¶6 After the December 2015 dip in production, the Cowan Well became profitable again, but--as Mr. Raker had informed Continental Resources--not too profitable. In January of 2016, Raker Resources began seeing the production of some fluid; and as early as May of 2016, Raker Resources observed occasional spikes in pressure readings at the Cowan Well.

¶7 Raker Resources was very proactive in trying to address these production problems. In February of 2016, Raker Resources started using more soap in its operations of the Cowan Well in an attempt to aerate the fluid and make it easier to expel.

¶8 Nevertheless, the Cowan Well's problems had not yet been completely resolved. In mid-November, the line pressure jumped to over 100 pounds of pressure, and the compressor never succeeded in drawing any fluid up out of the wellbore.

¶9 In the meantime, Tres C hired new attorneys at Andrews Davis, P.C. and became more active in pursuing termination of the Cowan Lease. On November 14th, Tres C entered into a lease option agreement with J&R Energy Resources, LLC (hereinafter "J&R Energy"), whereby J&R Energy would fund legal proceedings to secure the release, cancellation, or termination of the Cowan Lease in exchange for Tres C's promise to give J&R Energy an exclusive option to file a top lease at a later date.

¶10 December 6th served as a turning point for Continental Resources and its plans for Section 35-15N-13W. Continental Resources' "senses were alerted or heightened" because "you take . . . threats from Mahaffey & Gore, from that firm[,] seriously."

¶11 In short order, Continental Resources was able to shift its plans. On December 16th, the leader of Continental Resources' team circulated an internal e-mail laying out a plan to seek executive approval for drilling a 2-mile horizontal well by January 26, 2017.

¶12 Thereafter, Continental Resources took steps to get the Tres C Well drilled. On December 21st, Continental Resources staked the proposed location for the new Tres C Well in the NE/4 of Section 35-15N-13W.without protest a spacing unit in Section 2, such that Continental Resources could proceed with its plans to drill the multiunit well instead of a single-unit well.

¶13 Having seen where things were going at the Corporation Commission, J&R Energy's attorneys at Mahaffey & Gore exercised their rights under the lease option agreement and filed this equitable quiet title action on Tres C's behalf on February 27, 2017.

¶14 A three-day bench trial eventually ensued in September of 2019. The parties presented seventy-four exhibits and the following seven witnesses: (1) Tincy Cowan; (2) David Cowan; (3) Gary Raker; (4) Continental Resources' corporate representative, Matthew Simmons; (5) Continental Resources' former employee, Justin Crooks; (6) Tres C's expert in the field of petroleum engineering, Aaron Anderson; and (7) Defendants/Petitioners' expert in the field of petroleum engineering, J.P. Dick. Testimony regarding the Cowan Well's production was predictably split along party lines.

¶15 On one hand, Tres C argued the Cowan Well had become unprofitable such that the Cowan Lease had expired. Both of Tres C's principals relied upon their expert's purported conclusion that the Cowan Lease expired in November of 2016.

¶16 On the other hand, the defense witnesses offered testimony to the effect that the Cowan Well maintained production, either through actual profitability or mere capability. Mr. Simmons testified that Continental Resources believed the Cowan Well was profitable during the months of September, October, and November of 2016.capable of producing in paying quantities during those three months.

¶17 But beyond testimony about the Cowan Well, the defense put on evidence regarding Continental Resources' drilling of the new Tres C Well in order to bolster its claim that the Cowan Lease was still valid. Mr. Crooks painstakingly testified about all the steps that Continental Resources took toward drilling a well in Section 35, as well as the substantial resources spent on drilling the Tres C Well.

¶18 Nearly four months later on January 17, 2020, the trial court issued its Journal Entry of Judgment canceling the Cowan Lease in favor of Tres C. The trial court found that "[t]he costs associated with installation of the compressor on the Cowan Well [we]re lifting costs" and that "[t]he low volume fees charged by the gas purchaser [we]re to be deducted from gross revenue in determining whether the well produces in paying quantities," but the trial court found "[t]he insurance expenses on the Cowan Well [we]re not lifting costs."two days of no production and that a cessation of production occurred because "[t]he Cowan Well was not producing in paying quantities immediately prior to being 'shut-in' by Raker on October 17, 2016."

¶19 All three Defendants/Petitioners jointly filed a timely appeal of the trial court's judgment on February 14, 2020.

The main issue on appeal is to determine when "production" under the Habendum Clause ceases and the 60-day savings provision of the Cessation of Production Clause begins. Plaintiff contends this occurs any moment an interruption in actual, continuous profitable production occurs -- at which point(s) a lessee must immediately choose whether to commence drilling a new well or risk forfeiting its leasehold if profitable production does not resume within the savings period. Defendants contend the Habendum Clause remains in force and maintains the lease until there is a cessation of production in paying quantities for an unreasonable period of time gauged under all the circumstances from the perspective of a reasonable operator -- so a lessee need not undertake the burden of commencing a new well every time production dips below paying quantities.

Second, Defendants/Petitioners alleged the trial court erred in failing to address "whether Plaintiff's demand for release of the Subject Lease in March, 2016, and/or its repeated demand in November 2016 accompanied by its recorded top-lease" would permit them to take advantage of the obstruction doctrine by suspending operations and relieving them of their duty to produce in paying quantities until resolution of the title challenge.

¶20 This Court denied a motion to retain the appeal and instead assigned the matter to Division IV of the Court of Civil Appeals (COCA).

In their Brief at page 14, Raker and Continental stated:

Defendants do not seek review of the trial court's factual determinations in this lease cancellation suit. Defendants seek review of the legal standards applied by the trial court, including specific standards set forth in Hall v. Galmor, 2018 OK 59427 P.3d 1052

The trial court made extensive fact findings, all of which are admitted and now established. . . .

. . . .

. . . The Cowan Well ceased to produce in paying quantities in September 2016 and every month thereafter. . . . The trial court specifically found that the Cowan Well failed to produce in paying quantities for September, October and November 2016.

. . . .

The Cowan Lease is clear. The facts are established and not challenged. There was a cessation of production. Raker and Continental had sixty days to remedy the cause of the cessation of production or drill a new well. They did neither. Absent an additional, noncontract related defense, the Cowan Lease expired. The trial court did not err applying the facts to the Cowan Lease contract . . . .

Nevertheless, the COCA found that the trial court "left unaddressed the noncontractual defense of obstruction" and determined that the case should be remanded for the trial court to pass upon the defense as a matter of first instance.

¶21 On June 25, 2021, Defendants/Petitioners filed a petition for writ of certiorari, seeking this Court's review of whether the trial court erred in finding a cessation of production based upon a narrow 90-day window. This Court granted certiorari on January 31, 2022.

STANDARD OF REVIEW

¶22 This quiet title action is a matter of equitable cognizance. See Hall, 2018 OK 59Smith v. Marshall Oil Corp., 2004 OK 1085 P.3d 830Hininger v. Kaiser, 1987 OK 26738 P.2d 137Cotner v. Warren, 1958 OK 208330 P.2d 217Henry v. Clay, 1954 OK 170274 P.2d 545de novo standard. Id. ¶¶ 12--13, 427 P.3d at 1061. Thus, factual findings "will not be set aside unless, after a consideration of the entire record, it appears that such findings are clearly against the weight of the evidence." Id. ¶ 12, 427 P.3d at 1061 (quoting Briggs v. Sarkeys, Inc., 1966 OK 168418 P.2d 620Id. ¶ 13, 427 P.3d at 1061 (quoting State ex rel. Dep't of Human Servs. v. Baggett, 1999 OK 68990 P.2d 235

ANALYSIS AND REVIEW

¶23 The issue before this Court is whether it was legal error for the trial court to apply a rule of law that analyzed only a 3-month window of time for assessing whether the Cowan Well had experienced a cessation of production in paying quantities such that the Cowan Lease expired by its own terms. Stated more broadly, the issue concerns how to determine whether production that maintains a gas lease under the habendum clause has ceased, including whether the cessation-of-production clause plays any role in narrowing the window of time that should be considered in making such a determination.

¶24 Defendants/Petitioners contend that "whether a well remains capable of production and thus perpetuates the lease under the habendum clause is assessed over a reasonable look-back period of time sufficient to consider whether a prudent operator would continue or abandon operations."cessation--not merely an interruption--of profitable production has occurred.always engaged, so that a lessee must constantly evaluate the need to commence a new well to save its lease upon every interruption of profitable production" and must "constantly monitor production on a daily basis and be prepared to take action if production from any single day resulted in a loss"--a tenet which Defendants/Petitioners characterize as "contrary to Oklahoma law, and wholly unworkable for the oil and gas industry" insofar as it "imposes new, economically unworkable burdens on the Oklahoma oil and gas industry."Stewart v. Amerada Hess Corp., Pack v. Santa Fe Minerals, and Hall v. GalmorBlair v. Natural Gas Anadarko Co., 2017 OK CIV APP 57406 P.3d 580

¶25 Tres C counters that this Court cannot endorse Defendants/Petitioners' "reasonable look-back period" because the Cowan Lease's bargained-for cessation-of-production clause controls over the common law temporary cessation doctrine and gives Defendants/Petitioners only 60 days in which to restore production in paying quantities.Hoyt v. Continental Oil Co., French v. Tenneco Oil Co., and Hall v. Galmor.Pack and Blair cases on the basis that the parties therein had stipulated the wells at issue were capable of production in paying quantities, whereas the Cowan Well's capability was disputed.applicable teachings of Hoyt, French, and Hall found that the lease had expired pursuant to its terms due to a cessation of commercial production far in excess of 60 days."

¶26 Upon de novo review of the parties' proffered cases and arguments concerning this legal issue, we conclude that the trial court erred in determining that a cessation of production occurred based on Tres C's evidence that the Cowan Well was unprofitable for the three months of September, October, and November of 2016. Even if all the evidence--including the testimony of Tres C's expert, the calculations of the defense expert, and the admission of the operator, Gary Raker-- tends to show that the Cowan Well was operating at a loss during those three months, that period of time is, as a matter of law, too short for determining whether a cessation of production in paying quantities has occurred.

¶27 Tres C's and the trial court's reliance upon the cessation-of-production clause to establish a 3-month time period for assessing whether the well has lost its profitability such that a "cessation" has occurred is misplaced for several reasons.

¶28 First, we have repeatedly explained that the cessation-of-production clause is only implicated where production has already ceased--i.e., the clause only comes into play after a cessation has occurred. See Hall, 2018 OK 59Pack, 1994 OK 23accord 4 Kuntz, supra note 121, § 47.3(a)(1) (discussing the "[p]urpose and effect" of a cessation-of-production clause and stating "the clause is not activated and the prescribed period within which operations must be commenced does not begin to run until production in paying quantities has ceased under the test applied to the habendum clause"); 2 Kuntz, supra note 121, § 26.6 ("[I]f the 'production' requirement of the habendum clause is met, the cessation-of-production clause is not triggered." (citing Hall, 2018 OK 59Hall, 2018 OK 59Pack, 1994 OK 23French, 1986 OK 22Hoyt, 1980 OK 1after the applicable statute of limitations has expired and gives the plaintiff an extension of time for refiling a lawsuit, see, e.g., 12 O.S.2011, § 100after a cessation has occurred that could result in termination of an oil and gas lease under the habendum clause and gives the operator an extension of time for preserving the lease through the means specified in the clause. Therefore, the cessation-of-production clause and the 60-day time period contained therein have no bearing on anything that is done before the cessation occurs, including the assessment of whether a cessation has occurred.

¶29 Second, we agree with Defendants/Petitioners and their treatise that "[i]t is not the purpose of the cessation of production clause to establish an accounting period for purposes of determining if production is in paying quantities." 4 Kuntz, supra note 121, § 47.3(a)(1); accord Clifton v. Koontz, 325 S.W.2d 684, 690 (Tex. 1959) (" . . . however, if production never ceased, as is the case here, the 60-day clause is not definitive of the period over which the trier of the facts must determine whether a lease is producing in paying quantities"). Otherwise, leasehold operators subject to a 60-day cessation-of-production clause (like Defendants/Petitioners) would be required to commence drilling operations immediately upon sustaining a slight loss for one month without regard to whether they believed the next month's production might be profitable, because another month of slight loss could result in forfeiture of the lease. Such a result would be wholly unworkable in the oil and gas industry. Furthermore, if this Court used the cessation-of-production clause to establish a 3-month accounting period, we would indubitably burden leasehold operators with a duty to market continually in order to maintain the profitable production necessary to sustain the lease. Yet this Court rejected the imposition of such a duty under the cessation-of-production clause in the Pack case:

The lessors/mineral interest owners argue the term "production" used in this [cessation-of-production] clause includes removal and marketing of the product. They would require the lessee to continually market the gas from the well, and any cessation of such marketing for a period of sixty days or more would result in termination of the lease. We cannot accede to such a constrained construction of the clause as it discounts the intended meaning of production as this Court has determined in numerous cases. . . .

. . . If we were to conclude that the term "production" as used in the cessation of production clause means removal and marketing of the product as the mineral interest owners assert, . . . . [a]ny cessation of marketing for a sixty day period, under the lessors' interpretation of the clause, would constitute a violation of the clause resulting in termination of the lease. Such a result ignores the express terms of the habendum clause which provide for the lease to continue after the primary term as long as the well is capable of production in commercial quantities regardless of marketing.

. . . .

Thus, the clause does not require the lessee to market oil or gas actually extracted from the well. If the well was capable of production in commercial quantities at all times, but for a short period had less than commercial quantities marketed from it, the lessors would require the lessees to begin drilling operations for another well that under the facts would be unnecessary and uneconomical.

Pack, 1994 OK 23see also Voiles v. Santa Fe Minerals, Inc., 1996 OK 13911 P.2d 1205Pack case explained "that a lease capable of producing in paying quantities will not terminate under that [i.e., the cessation-of-production] clause for a failure to market gas for a sixty-day period" and concluding that there was no appetite for overruling Pack). Thus, in order to avoid unwanted results, we must steer clear of using the cessation-of-production clause to define a specific accounting period for determining whether production has been in paying quantities.

¶30 Instead, our case law provides that, when an appellate court is reviewing whether "the period employed by the trial court to determine profitability was sufficient," "the appropriate time period is not measured in days, weeks or months, but by a time appropriate under all of the facts and circumstances of each case." Barby v. Singer, 1982 OK 49648 P.2d 14accord Texaco, Inc. v. Fox, 618 P.2d 844 (Kan. 1980) (observing that "it is generally accepted that profitability on an oil and gas lease should be determined over a relatively long period of time in order to expose the operation to the leveling influences of time," discussing the downfalls of using time periods that are too short or too long, and holding that "[t]he better rule precludes the use of a rigid fixed term for determination of profitability and uses a reasonable time depending upon the circumstances of each case, taking into consideration sufficient time to reflect the current production status of the lease"); Clifton v. Koontz, 325 S.W.2d 684, 690 (Tex. 1959) (stating that "there can be no limit as to time, whether it be days, weeks, or months, to be taken into consideration in determining the question of whether paying production from the lease has ceased" and saying that "the trial court necessarily must take into consideration all matters which would influence a reasonable and prudent operator," including "a reasonable period of time under the circumstances"); see also 2 Kuntz, supra note 121, § 26.7(u) (generally discussing the "[p]eriod of time taken into account" for determining "[w]hat constitutes paying quantities"). This Court has repeatedly approved the use of reasonably lengthy accounting periods in assessing the profitability of a well's production. In the case of Barby v. Singer, 1982 OK 49648 P.2d 14Id. ¶ 6, 648 P.2d at 16. In the case of Smith v. Marshall Oil Corp., 2004 OK 1085 P.3d 830Id. ¶¶ 11, 14, 85 P.3d at 834--35. In the case of Henry v. Clay, 1954 OK 170274 P.2d 545see 2 Kuntz, supra note 121, § 26.7(u) & n.85--and found that a $46.15 deficit was no reason for "forfeit[ure] of his [i.e., the operator's] entire investment therein" simply because "the total cost of production at any particular time slightly exceed[ed] the actual returns to him." Henry, 1954 OK 170

¶31 Tres C argues that language from the Hoyt, French, and Hall cases mandates the time period set forth in the cessation-of-production clause will override any common-law requirement to utilize a reasonable time period. The language at issue states:

Where the parties have bargained for and agreed on a time period for a temporary cessation clause that provision will control over the common law doctrine of temporary cessation allowing a "reasonable time" for resumption of drilling operations,

Hoyt, 1980 OK 1quoted in French, 1986 OK 22

[A]ppellants contend that a determination of cessation of production paying quantities is dependent upon the selection of a proper time frame within which to base that calculation. Intertwined with these points is the contention that the 60-day period for resumption of operations specified in the lease does not become activated until the expiration of a reasonable period of time, thus giving the lessee a reasonable time to resume operations plus 60 days. Appellants' contention that a 60-day cessation clause is time in addition to a reasonable time for resumption of drilling is not well taken in light of the express language of Hoyt v. Continental Oil, supra, at p. 563,

French, 1986 OK 22

Where the law (by operation of the temporary cessation doctrine) would ordinarily give a lessee a "reasonable" amount of time in which to restore production, the cessation-of-production clause substitutes a bargained-for period of time that cannot be altered by any court's notion of reasonableness.

Hall, 2018 OK 59both the period of time that a court would look at to assess whether a cessation has occurred and the period of time allowed for resumption of operations after the cessation has occurred. Thus, by extension, Tres C wants this Court to recognize the cessation-of-production clause as a substitute for both periods of time, thereby limiting the period of time for assessing profitability to 60 days and, in the event such circumscribed data demonstrates unprofitability, leaving no time for resumption of drilling operations.

¶32 Such arguments are unconvincing for three reasons.

¶33 First, the quoted language from Hoyt, French, and Hall undermines Tres C's position insofar as it discusses the time "for resumption of drilling operations" or for "restor[ation of] production." The language clearly presupposes that a cessation has already occurred; otherwise there would be no need to resume drilling or reworking. Nothing illustrates this more clearly than the quoted language from the French case, where the Court characterized the issue before it in terms of whether the lessee would receive "a reasonable time . . . plus 60 days" in order "to resume operations." The French Court did not characterize the issue in terms of whether the lessee would have a reasonable time to assess profitability and then, if the well proved unprofitable such that production had ceased, get 60 days more to resume operations--which is the issue in this case. Looking at the quoted language alone, it would seem that both the cessation-of-production clause and the temporary cessation doctrine only come into play after a cessation has occurred. The name of the doctrine also bolsters the notion that it is triggered by a "cessation," albeit a "temporary" one. Thus, neither the cessation-of-production clause nor the temporary cessation doctrine have anything to do with the reasonable time period that governs the pre-cessation assessment of profitability.

¶34 Second, despite the quoted language from the Hoyt, French, and Hall cases, the cessation-of-production clause was never designed to eliminate or to avoid the operation of the temporary cessation doctrine as Tres C argues. Defendants/Petitioners' proffered treatise perhaps says it best:

It is possible for the literal provisions of the various forms of the dry hole clause and cessation of production clause to be construed to prevent the application of the doctrine of temporary cessation of production. The period of time within which operations must be commenced has been treated as a contractual definition of temporary cessation [citing Hoyt and French, along with cases from other jurisdictions]. . . .

. . . .

An indiscriminate application of such rule can, however, lead to results that the parties were not likely to have intended when they included such a clause in the lease. A typical clause that combines the dry hole clause and cessation of production clause may vary as to the period of time allowed, but it will contain language that is the same or similar to the following language:

"If prior to the discovery oil or gas, lessee should drill a dry hole or holes thereon, or if after the discovery of oil or gas in paying quantities, the production thereof should cease from any cause, this lease shall not terminate if the lessee commences additional drilling or reworking operations within thirty days thereafter or (if it should be in the primary term) commences additional drilling operations or resumes the payment of rentals. . . ."

The fact that the event which is designed to prevent termination is the commencement of drilling or reworking operations gives some indication of the purpose of the clause and the intention of the parties. It indicates that the parties are concerned with a situation where cessation of production is of the type that is remedied by drilling or reworking operations. Thus, the parties must have intended that the clause would become operative if a dry well is drilled or if a producing well ceases to be capable of producing in paying quantities. A literal application of the clause to every temporary cessation of production could lead to absurd results.

Thus, if the marketing of production should be interrupted because of a rupture of the purchaser's pipeline, it is not likely that the parties intended that the lease could be preserved only by commencing drilling or reworking operations on the lease, when such operations would not correct the difficulty. The problem is not a great one in a jurisdiction such as Oklahoma, where marketing is not required for production, because, by definition, production would not have ceased. . . .

The doctrine of temporary cessation of production is a practical necessity, because oil and gas are never produced and marketed in a continuous, uninterrupted operation that goes on every hour of the day and night. Once it is recognized that any brief interruption in the operation must be tolerated as a practical matter, it becomes necessary to adopt a doctrine that permits temporary cessations of production. The resumption of operations clause [i.e., a short-hand reference to the combined dry hole clause and cessation-of-production clause] was never designed to eliminate or to avoid the operation of such doctrine or to require that oil or gas be produced and marketed in a continuous, uninterrupted operation. It was intended to preserve a lease in order to permit a lessee to restore production if production should cease under circumstances that require drilling or reworking on his part in order to restore production. Accordingly, it would be more reasonable to construe the resumption of operations clause so that the clause "or if after the discovery of oil or gas in paying quantities, the production thereof should cease from any cause" refers not to the temporary cessation of production, but to a cessation of production that would be permanent unless corrected by reworking or drilling operations.

2 Kuntz, supra note 121, § 26.13(b) (emphasis added) (footnotes omitted); see also 4 Kuntz, supra note 121, § 47.3(a) ("It is submitted that, regardless of the location of the clause, it would be more reasonable to construe the cessation of production clause so that the provision 'or if after the discovery of oil or gas in paying quantities the production thereof should cease from any cause' refers not to a temporary cessation of production but to a cessation of production that would be permanent unless corrected by reworking or drilling operations."). In the case before us, the event which can prevent termination under the Cowan Lease's cessation-of-production clause is the "resum[ption of] operations for drilling a well within sixty (60) days from such cessation."see supra ¶ 28, and in light of the strong policy of our statutory law against forfeiture of estates as embodied in 23 O.S.2011, § 2see Stewart v. Amerada Hess Corp., 1979 OK 145604 P.2d 854

¶35 Lastly, Tres C's reliance upon the Hoyt and French cases is misguided insofar as this Court has previously distinguished those cases in a way that limits their applicability to situations where the subject wells are incapable of producing when the primary term of the lease expires and are thus unable to produce during the secondary term. See Pack, 1994 OK 23Hoyt and French are inapposite.

CONCLUSION

¶36 We conclude the trial court erred when it relied upon the cessation-of-production clause to establish a 3-month time period for assessing whether a cessation of production in paying quantities had occurred.

¶37 The judgment of the trial court is reversed. Had the trial court applied the appropriate rule of law and analyzed the Cowan Well's profitability over "a time [period] appropriate under all of the facts and circumstances," Barby, 1982 OK 49

OPINION OF THE COURT OF CIVIL APPEALS VACATED;
JUDGMENT OF THE TRIAL COURT REVERSED;
CASE REMANDED FOR FURTHER PROCEEDINGS 
NOT INCONSISTENT WITH THIS OPINION.

KANE, C.J., and KAUGER, WINCHESTER, EDMONDSON, COMBS, GURICH, DARBY, and KUEHN, JJ., concur.

ROWE, V.C.J., concurs in result.

FOOTNOTES

see also ROA p.000574, Journal Entry of J. ¶ 9, at 2 (quoting only the second sentence).

Id., Jt. Trial Ex. 1, Okla. Corp. Comm'n Well Record (Form 1002A) 1; ROA p.000596, Trial Tr. vol. II, 239:4--:17 (testimony of defense expert J.P. Dick); ROA p.000574, Journal Entry of J. ¶ 5, at 2.

See ROA p.000595, Trial Tr. vol. I, 84:5--:21 (testimony of Gary Raker); ROA p.000596, Trial Tr. vol. II, 41:11--:14, Sept. 25, 2019 (testimony of Continental Resources' corporate representative, Matthew Simmons); ROA p.000574, Journal Entry of J. ¶ 7, at 2.

See ROA p.000595, Trial Tr. vol. I, 85:2--:4 (testimony of Gary Raker).

See ROA p.000574, Journal Entry of J. ¶ 6, at 2.

Incidentally, after the writ of certiorari was granted in this appeal, Tres C filed a Notice of the G.D. Cowan #1 Well Plugging on February 18, 2022. Therein, Tres C informs this Court that Raker Resources has "plugged and abandoned the Cowan Well" and attaches a Plugging Record (Form 1003) that Gary Raker filed with the Oklahoma Corporation Commission on April 15, 2021. Notice of G.D. Cowan #1 Well Plugging 1 & ex. 1. Thus, it appears that Raker Resources is not currently operating the Cowan Well. Nevertheless, this was an improper attempt to supplement the record on appeal with information that was not presented to the trial court or the Court of Civil Appeals, and Tres C's Notice has been stricken by separate order filed concurrently with this opinion.

See ROA p.000596, Trial Tr. vol. II, 42:15--43:4 (testimony of Matthew Simmons).

See id. at 147:19--:25 (testimony of Matthew Simmons).

See id. at 98:19--99:12 (testimony of Gary Raker); ROA p.000598, Jt. Trial Ex. 125, J.P. Dick's Production Graph 1 (depicting a steady decline in the Cowan Well's production from 6 Mcf per day in late 2007 to 1.5 Mcf per day in March 2009).

See ROA p.000596, Trial Tr. vol. II, 99:7--100:2 (testimony of Gary Raker).

See id. at 99:7--100:2 (testimony of Gary Raker); id. at 241:4--:17 (testimony of defense expert J.P. Dick); ROA p.000598, Jt. Trial Ex. 125, J.P. Dick's Production Graph 1 (showing that production increased from 1.5 Mcf per day to anywhere between 28 Mcf and 50 Mcf for the remainder of 2009).

See ROA p.000595, Trial Tr. vol. I, 44:22--45:4 (testimony of Tincy Cowan).

See ROA p.000595, Trial Tr. vol. I, 87:25--90:21 (testimony of Gary Raker); ROA p.000596, Trial Tr. vol. II, 79:2--80:24, 120:10--122:18 (testimony of Gary Raker); ROA pp.000574--000575, Journal Entry of J. ¶ 12, at 2--3.

See id. (showing production amounts for January to November of 2015 that ranged from 677 Mcf to 891 Mcf, then a dip in December of 2015 to 432 Mcf, then a rebound to 752 Mcf and 589 Mcf in the first two months of 2016; but also showing similar dips in 2013 and 2014); ROA p.000574, Journal Entry of J. ¶ 10, at 2.

Id., Jt. Trial Ex. 76, E-mail from Gary Raker, Raker Res., LLC, to Jay Buckley, Cont'l Res., Inc. 3--4 (July 15, 2016, 6:59 AM).

Id., Jt. Trial Ex. 113, Letter from Gary Raker, Raker Res., LLC, to Luke Adams, Tisdal & O'Hara 1--26 (July 18, 2016).

Id. at 4.

See, e.g., id., Jt. Trial Ex. 6, Raker Res. Gauge Sheets 8--12 (showing the production of 3 barrels of water in January of 2016, 3 barrels in February, nearly 2 barrels in June, 10 barrels in July, 13 barrels in August, and 5 barrels in September and also showing line pressure (LP) readings for May through September of 2016 mostly in the 30- to 40-pound range with occasional spikes in the 80- to 100-pound range).

See id., Jt. Trial Ex. 71, E-mails between Gary Raker, Raker Res., LLC, and Michael Schooley, Cont'l Res., Inc., 2 (Oct. 21, 2016, 11:04 AM) (wherein Mr. Raker attributed the problem "to high line pressure" that "may be due to new wells nearby packing the line"); ROA p.000596, Trial Tr. vol. II, 88:11--92:15 (wherein Mr. Raker testified during Defendants/Petitioners' case-in-chief that "we did see 80-pound line pressure there the first of the month" of September and "whenever I see production -- especially on this well -- production gradually going down, you think liquid loading, at least that's my working hypothesis"); ROA p.00595, Trial Tr. Vol. I, 95:13--:19, 106:4--:16 (wherein Mr. Raker testified during Plaintiff/Respondent's case-in-chief that "part of . . . [his] assumption or [his] theory" for the Cowan Well's low production was "high line pressure in the area" and "part of [his] theory of what was the problem is that liquid loading").

See id., Jt. Trial Ex. 5, Raker Res. Jt. Interest Billings 11 (showing production of only 286 Mcf and a negative net revenue).

See ROA p.000598, Jt. Trial Ex. 6, Raker Res. Gauge Sheets 13.

See id., Jt. Trial Ex. 8, Enable Gathering & Processing, LLC's Gas Volume Statement 61 (showing gas production for 10/15/2016 and 10/16/2016 of 0 Mcf); id., Jt. Trial Ex. 6, Raker Res. Gauge Sheets 13 (showing gas production on October 15 and 16 of 7 Mcf and 2 Mcf, respectively); ROA p.000595, Trial Tr. vol. I, 112:10--113:19 (testimony of Gary Raker).

See ROA p.000598, Jt. Trial Ex. 5, Raker Res. Jt. Interest Billings 8--13 (showing expenses for "SOAP" or "KEL-TECH" or "FOAMER" for February, March, April, May, July, September, October, and November).

See id., Jt. Trial Ex. 6, Raker Res. Gauge Sheets 11 (showing notes that the flow of pressure was "Switched [to the] Casing Side" and then back "To Coil Tubing" on August 22nd and 23rd).

See ROA p.000596, Trial Tr. vol. II, 92:23--93:20 (testimony of Gary Raker).

See ROA p.000598, Jt. Trial Ex. 5, Raker Res. Jt. Interest Billings 12; see also id., Jt. Trial Ex. 10, Invoices for the Cowan Well 13--22 (showing the several invoices that correlate to the expenses listed on the joint interest billings).

Id.

See ROA p.000596, Trial Tr. vol. II, 95:20--96:1, 97:18--:23 (wherein Gary Raker testified that production "was not as good as we hoped" when the Cowan Well was first brought back online, but "they finally got it lined out there towards the middle of the month there. [November] 16th they got -- brought it back on over 20 a day . . . . which was encouraging, you know. It was kind of back up to where it was").

See id. at 96:2--:9, 97:24--98:2 (testimony of Gary Raker).

See ROA p.000598, Jt. Trial Ex. 5, Raker Res. Jt. Interest Billings 12--13 (showing negative "Net Cash" amounts for October and December and showing a positive "Net Cash" amount for November only because of some creative accounting whereby a $749.68 expense from October was credited back so that it could be spread out over several months, which credit had the effect of negating all other expenses and even contributing an additional amount towards revenue).

See id., Jt. Trial Ex. 114, Letter from Edward Voda, J&R Energy Res., LLC, to Viola Cowan, Tres C, LLC, 1 (Nov. 14, 2016). Interestingly, the address on J&R Energy's letterhead matches the return address on the Andrews Davis law firm's letterhead. Compare id., with id., Jt. Trial Ex. 115, Letter from Randy C. Smith, Andrew Davis, to DewBlaine Energy, LLC 1--2 (Nov. 16, 2016).

Id., Jt. Trial Ex. 114, Letter from Edward Voda, J&R Energy Res., LLC, to Viola Cowan, Tres C, LLC, 1 (Nov. 14, 2016); see also ROA p.000595, Trial Tr. vol. I, 47:13--48:15, 52:21--54:14, Sept. 24, 2019 (wherein Tincy Cowan testified about this agreement, providing some of the redacted details, and testified that J&R did "perform under this contract").

Id., Jt. Trial Ex. 115, Letter from Randy C. Smith, Andrew Davis, to DewBlaine Energy, LLC 1 (Nov. 16, 2016).

Id. at 1--2.

Id., Jt. Trial Ex. 77, E-mail from Jongsoo "Vincent" Kim, DewBlaine Energy, LLC, to Justin Crooks, Cont'l Res., Inc., 2 (Dec. 5, 2016, 6:15 PM).

Id., Jt. Trial Ex. 74, E-mail from Gary Raker, Raker Res., LLC, to Michael Schooley, Cont'l Res., Inc., 1 (Dec. 6, 2016, 4:02:27 PM); see also ROA p.000596, Trial Tr. vol. II, 101:21--105:22 (testimony of Gary Raker). According to the entries of appearance filed in this appeal, the lawyer who placed the phone call now works for a different law firm; the lawyer represented Tres C until March 26, 2020, when this Court granted a motion to withdraw as counsel of record.

Id.

Id. at 191:16--:23 (testimony of Continental Resources' former employee, Justin Crooks).

Id., Jt. Trial Ex. 79, E-mail from Gary Raker, Raker Res., LLC, to Justin Crooks, Cont'l Res., Inc., 1--2 (Dec. 6, 2016, 11:33 PM).

See ROA p.000596, Trial Tr. vol. II, 59:10--61:19 (testimony of Matthew Simmons); id. at 149:13--155:17 (same); id. at 191:24--192:7 (testimony of Justin Crooks).

Id., Jt. Trial Ex. 24, Appl. 1--2, In re Appl. of Cont'l Res., Inc. for Pooling in Section 2-14N-13W, Cause CD No. 201603738 (Okla. Corp. Comm'n Aug. 24, 2016); id., Jt. Trial Ex. 25, Appl. 1, In re Appl. of Cont'l Res., Inc. to Establish 640-Acre Drilling & Spacing Unit in Section 2-14N-13W, Cause CD No. 201603737 (Okla. Corp. Comm'n Aug. 24, 2016); id., Jt. Trial Ex. 26, Appl. 1, In re Appl. of Cont'l Res., Inc. to Establish 640-Acre Drilling & Spacing Unit in Section 35-15N-13W, Cause CD No. 201603739 (Okla. Corp. Comm'n Aug. 24, 2016).

Id., Jt. Trial Ex. 28, Order of the Comm'n 1--2, In re Appl. of Cont'l Res., Inc. to Establish 640-Acre Drilling & Spacing Unit in Section 35-15N-13W, Cause CD No. 201603739 (Okla. Corp. Comm'n Oct. 7, 2016).

Id., Jt. Trial Ex. 78, E-mail from Jeff Cook, Cont'l Res., Inc., to Trent Guinn et al., Cont'l Res., Inc., 1--2 (Dec. 16, 2016, 2:41 PM).

Id.; see also ROA p.000596, Trial Tr. vol. II, 68:20--72:16 (testimony of Matthew Simmons); id. at 195:3--:12, 197:2--:20 (testimony of Justin Crooks).

Sooner Trend oil field in the Anadarko basin, which is located primarily in Canadian and Kingfisher Counties. It also covers portions of Blaine County, including Section 35-15N-13W.

See ROA p.000596, Trial Tr. vol. II, 193:13--194:4, 201:11--:16, 207:1--:15 (testimony of Justin Crooks).

Id., E-mail from Gary Raker, Raker Res., LLC, to Justin Crooks, Cont'l Res., Inc., 1 (Dec. 16, 2016, 9:11:42 PM +0000).

Id., Jt. Trial Ex. 83, E-mail from Justin Crooks, Cont'l Res., Inc., to Gary Raker, Raker Res., LLC, 1 (Dec. 21, 2016, 6:56 PM).

Id., Jt. Trial Ex. 34, Well Location Plat 1; id., Jt. Trial Ex. 66, Cont'l Res., Inc. Location Report 1; ROA p.000596, Trial Tr. vol. II, 203:25--204:11 (testimony of Justin Crooks).

See generally 52 O.S.2021, § 318.3id. § 318.5(A) ("Prior to entering the site with heavy equipment, the operator shall negotiate with the surface owner for the payment of any damages which may be caused by the drilling operation. . . .").

See id., Trial Tr. vol. I, 72:1--:4, 77:10--78:1; Cont'l Res., Inc. v. Tres C, L.L.C., No. CJ-2017-0003 (Blaine Cty. Dist. Ct. filed Jan. 17, 2017). See generally 52 O.S.2021, § 318.5

Id., Jt. Trial Ex. 42, Appl. 1, In re Appl. of Cont'l Res., Inc. for Multiunit Horizontal Well, Cause CD No. 201700062 (Okla. Corp. Comm'n filed Jan. 6, 2017); id., Jt. Trial Ex. 38B, Appl. 1, In re Appl. of Cont'l Res., Inc. for Well Location Exception, Cause CD No. 201700063 (Okla. Corp. Comm'n filed Jan. 6, 2017); id., Jt. Trial Ex. 43, Appl. 1, In re Appl. of Cont'l Res., Inc. for Well Location Exception, Cause CD No. 201700064 (Okla. Corp. Comm'n filed Jan. 6, 2017).

Id., Jt. Trial Ex. 40, Notice of Hr'g 1--2, In re Appl. of Cont'l Res., Inc. for Multiunit Horizontal Well, Cause CD No. 201700062 (Okla. Corp. Comm'n Jan. 6, 2017); id., Jt. Trial Ex. 41, Notice of Hr'g 1--2, In re Appl. of Cont'l Res., Inc. for Well Location Exception, Cause CD No. 201700063 (Okla. Corp. Comm'n Jan. 6, 2017).

Id., Jt. Trial Ex. 66, Cont'l Res., Inc. Location Report 1; ROA p.000596, Trial Tr. vol. II, 203:25--204:4, 204:12--:16 (testimony of Justin Crooks); ROA pp.000574, 000577, Journal Entry of J. ¶¶ 7, 32, at 2, 5.

In re Appl. of Cont'l Res., Inc. for Multiunit Horizontal Well, Cause CD No. 201700062 (Okla. Corp. Comm'n filed Jan. 27, 2017); id., Jt. Trial Ex. 50, Entry of Appearance & Notice of Protest 1, In re Appl. of Cont'l Res., Inc. for Well Location Exception, Cause CD No. 201700063 (Okla. Corp. Comm'n filed Jan. 27, 2017); id., Jt. Trial Ex. 52, Entry of Appearance & Notice of Protest 1, In re Appl. of Cont'l Res., Inc. for Well Location Exception, Cause CD No. 201700064 (Okla. Corp. Comm'n filed Jan. 27, 2017).

See, e.g., id., Jt. Trial Ex. 59, Emergency Order ¶ 3, at 1, In re Appl. of Cont'l Res., Inc. for Multiunit Horizontal Well, Cause CD No. 201700062 (Okla. Corp. Comm'n Mar. 9, 2017).

Id., Jt. Trial Ex. 54, Appl. for Emergency Order ¶ 2, at 1, In re Appl. of Cont'l Res., Inc. for Multiunit Horizontal Well, Cause CD No. 201700062 (Okla. Corp. Comm'n filed Feb. 3, 2017); id., Jt. Trial Ex. 56, Appl. for Emergency Order ¶ 2, at 2, In re Appl. of Cont'l Res., Inc. for Well Location Exception, Cause CD No. 201700063 (Okla. Corp. Comm'n filed Jan. 6, 2017).

Id., Jt. Trial Ex. 59, Emergency Order 1--2, In re Appl. of Cont'l Res., Inc. for Multiunit Horizontal Well, Cause CD No. 201700062 (Okla. Corp. Comm'n Mar. 9, 2017); id., Jt. Trial Ex. 60, Emergency Order 2, In re Appl. of Cont'l Res., Inc. for Well Location Exception, Cause CD No. 20170063 (Okla. Corp. Comm'n Mar. 9, 2017).

Id., Jt. Trial Ex. 65A, Okla. Corp. Comm'n Completion Report 1; id., Jt. Trial Ex. 36, Cont'l Res., Inc. Auth. for Expenditure 3 (showing Continental Resources' authorization on February 23rd to spend $9,397,169 towards completion of the multiunit Tres C Well); ROA p.000596, Trial Tr. vol. II, 215:25--216:7, 217:19--218:3 (testimony of Justin Crooks).

id. at 72:18--:25 (testimony of David Cowan).

Id. at 197:1--:3 (testimony of Aaron Anderson).

Id. at 152:1--:15, 173:13--:23.

Id. at 80:15--81:13, 83:2--:8, 94:9--19, 101:21--106:5, 108:9--109:16, 111:11--112:9 (testimony of Gary Raker); see also id. at 142:24--143:17 (testifying that, based on his experience, a reasonable operator would not have abandoned the Cowan Well in October, November, December, or January).

See id. at 223:13--225:11, 229:9--:23 (testimony of Justin Crooks).

See id. at 266:14--:19, 267:9--:13, 273:7--274:16 (testimony of J.P. Dick); ROA p.000597, Trial Tr. vol. III, 18:18--19:25 (testimony of J.P. Dick).

See ROA p.000596, Trial Tr. vol. II, 274:14--277:24 (testimony of J.P. Dick).

See ROA p.000597, Trial Tr. vol. III, 73:3--:13 (testimony of J.P. Dick).

Id. at 72:11--73:2.

See generally ROA p.000596, Trial Tr. vol. II, 191:9--219:10 (testimony of Justin Crooks).

Id. at p.000575, Journal Entry of J. ¶ 15, at 3.

Id. at pp.000575--000577, Journal Entry of J. ¶¶ 16--20, 26--27, at 3--5.

Id. at p.000577, Journal Entry of J. ¶¶ 28--29, at 5.

Id., Journal Entry of J. ¶¶ 31--34, at 5; see also id. at p.000574, Journal Entry of J. ¶ 7, at 2 ("Continental commenced operations for the drilling of the well in January, 2017.").

Id. at p.000577, Journal Entry of J. ¶ 34, at 5.

Id., Journal Entry of J. ¶ 36, at 5.

Compare Pet. in Error ex. C (listing five issues to be raised on appeal, including the trial court's alleged error in not considering Continental Resources' preparatory acts to drill the new Tres C Well occurring prior to January 19, 2017, as well as the trial court's alleged error in counting compressor expenses and low-volume fees as "lifting costs"), with Appellants' Br. 13--14 (only listing the two issues discussed infra).

Id. at 13--14.

Id. at 14, 26--28.

Id. at 14.

Id. at 11.

Id.

See id. at 1--3.

Id. at 5--6.

Id. at 5; see also id. at 1, 6--10 & n.1 (citing and quoting Hall, 2018 OK 59427 P.3d 1052Pack, 1994 OK 23869 P.2d 323Stewart, 1979 OK 145604 P.2d 854

Id. at 5; see also id. at 1--2, 6--8 & n.3 (citing and quoting 2 Eugene Kuntz, A Treatise on the Law of Oil and Gas §§ 26.6, 26.7(u), 26.13(b) (1990 & Supp. 2021); 4 Eugene Kuntz, A Treatise on the Law of Oil and Gas § 47.3(a)(1) (Supp. 2021)).

See id. at 1, 8 & n.2.

 Resp. to Appellants' Pet. for Writ of Cert. 1--4 (citing and quoting Hall, 2018 OK 59427 P.3d 1052French, 1986 OK 22725 P.2d 275Hoyt, 1980 OK 1606 P.2d 560

 Resp. to Appellants' Pet. for Writ of Cert. 5, 8 (citing Pack, 1994 OK 23Blair, 2017 OK CIV APP 57406 P.3d 580

Id. at 9.

If any action is commenced within due time, and a judgment thereon for the plaintiff is reversed, or if the plaintiff fail in such action otherwise than upon the merits, the plaintiff . . . may commence a new action within one (1) year after the reversal or failure although the time limit for commencing the action shall have expired before the new action is filed.

12 O.S.2011, § 100

See supra note 5 and accompanying text (emphasis added).

See supra notes 32 through 41 and accompanying text.

See supra notes 101--102 and accompanying text.

See supra notes 32 through 41 and accompanying text.

See supra notes 101 and accompanying text.