OSCN Found Document:TRES C v. RAKER RESOURCES

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only

 
 
 

 
 TRES C v. RAKER RESOURCES
2023 OK 13
532 P.3d 1
Case Number: 118650
Decided: 02/14/2023
THE SUPREME COURT OF THE STATE OF OKLAHOMA

Cite as: 2023 OK 13, 532 P.3d 1

 
 

TRES C, LLC, Plaintiff/Respondent,
v.
RAKER RESOURCES, LLC; CONTINENTAL RESOURCES, INC.; and DEWBLAINE ENERGY, LLC, Defendants/Petitioners.

ON CERTIORARI FROM 
THE COURT OF CIVIL APPEALS, DIVISION IV

¶0 This appeal concerns the trial court's judgment after a bench trial that granted Plaintiff/Respondent's petition to cancel Defendants/Petitioners' oil and gas lease and to quiet title in its favor so that a third party can exercise the option of executing a new lease. The Court of Civil Appeals conditionally affirmed the trial court's judgment, but remanded the matter with instructions to address the noncontractual defense of obstructions, which is set forth in Jones v. Moore, 1959 OK 23, ¶ 0, 338 P.2d 872, 873. We granted certiorari to address whether the trial court erred in applying a rule of law that analyzed only a 3-month window of time for assessing whether a dip in the existing well's production was a cessation of production in paying quantities such that Defendants/Petitioner's lease expired by its own terms. On de novo review, we find that the trial court did err insofar as it relied upon the lease's cessation-of-production clause to define the time period for assessing profitability. We vacate the Court of Civil Appeals' opinion, reverse the trial court's judgment, quiet title in favor of Defendants/Petitioners, and remand the case for further proceedings not inconsistent with this opinion.

OPINION OF THE COURT OF CIVIL APPEALS VACATED; 
JUDGMENT OF THE DISTRICT COURT REVERSED; 
CASE REMANDED FOR FURTHER PROCEEDINGS 
NOT INCONSISTENT WITH THIS OPINION.

Jana L. Knott, BASS LAW, Oklahoma City, Oklahoma; and Travis P. Brown, Cody J. McPherson, and Scott R. Verplank, MAHAFFEY & GORE, P.C., Oklahoma City, for Plaintiff/Respondent.

Harvey D. Ellis and Andrew E. Henry, CROWE & DUNLEVY, Oklahoma City, Oklahoma, for Defendants/Petitioners.

Jennifer Schnell Kaiser, CONTINENTAL RESOURCES, INC., Oklahoma City, Oklahoma, for Defendant/Petitioner Continental Resources, Inc.

COMBS, J.:

FACTUAL AND PROCEDURAL BACKGROUND

¶1 Plaintiff/Respondent Tres C, LLC (hereinafter "Tres C") is an Oklahoma limited liability company whose members are Viola "Tincy" Cowan, her son David Cowan, her daughter Karlea Cowan Ewald, her grandson Scot Meier, and her granddaughter Marsha Bukowski.[1] Tres C is a successor-in-interest to certain mineral interests in the 320-acre lot contained in the northern half of Section 35, Township 15 North, Range 13 West (i.e., N/2 of 35-15N-13W in abbreviated form) of Blaine County, Oklahoma, that were formerly owned by the parents of Tincy's late husband, George and Coral Cowan.[2]

¶2 In February of 1955, George and Carol Cowan, executed an oil and gas lease in favor of J.J. Wright (hereinafter "the Lessee") concerning those mineral interests in Section 35-15N-13W of Blaine County (hereinafter "the Cowan Lease").[3] Under its habendum clause, the Cowan Lease would remain valid for a primary term lasting 10 years and then--so long as a producing well was drilled--for a secondary term lasting "as long thereafter as oil, gas, casinghead gas, casinghead gasoline, or any of the products covered by this lease is or can be produced."[4] The Cowan Lease also contained a cessation-of-production clause providing:

If within the primary term of this lease, production on the leased premises shall cease from any cause, this lease shall not terminate provided operations for the drilling of a well shall be commenced before or on the next ensuing rental paying date; or, provided lessee begins or resumes the payment of rentals in the manner and amount hereinbefore provided [in Paragraph 5 of the Cowan Lease]. If, after the expiration of the primary term of this lease, production on the leased premises shall cease from any cause, this lease shall not terminate provided lessee resumes operations for drilling a well within sixty (60) days from such cessation, and this lease shall remain in force during the prosecution of such operations and, if production results therefrom, then as long as production continues.[5]

In 1965 during the primary term of the Cowan Lease, Sun Oil Company (a former successors-in-interest to the Lessee) drilled and completed the G.D. Cowan No. 1 Well (hereinafter "the Cowan Well") into the Morrow formation in the northwest quarter (NW/4) of Section 35-15N-13W.[6] The Cowan Well produced oil and gas in paying quantities, and the Cowan Lease moved into the secondary term defined by the habendum clause shortly after completion.

¶3 Defendants/Petitioners are the Lessee's current successors-in-interest under the Cowan Lease.[7] In April of 2009, DMS Oil Company (hereinafter "DMS Oil")--acting through its vice president, Gary Raker--purchased both the Cowan Well and an assignment of all leaseholds in Section 35-15N-13W from the Kaiser-Francis Oil Company (another former successor-in-interest to the Lessee) for $35,000.[8] Less than a year later in March of 2010, DMS Oil assigned all of its Section 35-15N-13W leasehold rights outside of the wellbore for the Cowan Well to Defendant/Petitioner Continental Resources, Inc. (hereinafter "Continental Resources") in exchange for approximately $500,000 and a 7.5% overriding royalty (ORR) interest in any future well drilled by Continental Resources.[9] Then, in March of 2012, Gary Raker formed his own company, Defendant/Petitioner Raker Resources, LLC (hereinafter "Raker Resources"); and that company bought out DMS Oil Company's interest in the Cowan Well the very next month.[10] Thus, for purposes of this appeal, Raker Resources is the operator of the Cowan Well.[11] Defendant/Petitioner DewBlaine Energy, LLC (hereinafter "DewBlaine Energy") is a Delaware limited liability company under the control of a South Korean parent company, and it is engaged in a joint venture with Continental Resources for oil and gas exploration in the Woodford formation in an area of mutual interest (AMI) that covers portions of Dewey, Blaine, Custer, and Caddo Counties.[12] Thus, Continental Resources' ability to drill a well in Section 35-15N-13W was only limited by Raker Resources exclusive rights in the Morrow formation and by DewBlaine Energy's 49.9% interest in the Woodford formation.[13]

¶4 When DMS Oil first acquired the Cowan Well in April of 2009, the well was producing, but at low rates.[14] Nevertheless, Mr. Raker was convinced that the well could be revived because it had good pressure.[15] Through his supervision of operations, production increased by at least twenty-fold within the first year.[16]

¶5 Things continued as normal until early 2016, when Tres C's royalty checks from Raker Resources allegedly began to arrive sporadically.[17] That's when Tres C hired its first set of lawyers from Tisdal & O'Hara. On March 30, 2016, Tres C's lawyer sent Raker Resources a letter claiming the "relevant production records . . . evidence that the GD Cowan No. 1 well has long since ceased producing in paying quantities . . . . [and that] the captioned Lease has expired by its terms" and "demand[ing] that the well be plugged and abandoned, the surface restored to its original condition and the captioned Lease be released of record within 30 days of your receipt of this letter."[18] Because of the demand letter, Raker Resources reduced the pumper fee by $100 per month in order to reduce the Cowan Well's expenses and to maintain its production in paying quantities.[19] Raker Resources then sent a response to Tres C's attorney on April 11th, ensuring him that "the well has indeed been producing in paying quantities" and enclosing figures showing the amount of gas production for each month since January of 2012.[20] Those figures demonstrated a dip in production in December of 2015, but nothing beyond the pale for the reported years.[21] Two weeks later, Raker Resources also notified Continental Resources of Tres C's demand letter; informed Continental Resources that the Cowan Well "makes more revenue than costs, but not a whole lot more"; and asked whether Continental Resources had any plans to protect its leasehold interests in Section 35-15N-13W by drilling a new well or by purchasing the Cowan Well and taking control of its operations.[22] On June 14th, Tres C's lawyer sent Raker Resources a follow-up letter asking that it produce "documentation evidencing the wells [sic] costs and revenue from January 2012 to the current date . . . . in their native format as they are kept in the normal course of business within 45 days of your receipt of this letter."[23] On July 15th, Raker Resources notified Continental Resources of Tres C's second demand letter.[24] Then three days later, Raker Resources sent a response to Tres C's lawyer enclosing the Cowan Well's costs and revenues from April 2012 to June 2016.[25] Raker's documentation showed the same pattern as the gas production figures but further revealed that the dip in production during December of 2015 had in fact been unprofitable.[26]

¶6 After the December 2015 dip in production, the Cowan Well became profitable again, but--as Mr. Raker had informed Continental Resources--not too profitable. In January of 2016, Raker Resources began seeing the production of some fluid; and as early as May of 2016, Raker Resources observed occasional spikes in pressure readings at the Cowan Well.[27] To the extent the Cowan Well was having any issues with gas production, Mr. Raker blamed the increased line pressure and fluid buildup.[28] Then in September of 2016, the Cowan Well experienced another month of low production and unprofitability.[29] Throughout October of 2016, the line pressure started steadily creeping up from 50 to 70 pounds,[30] until the Cowan Well failed to produce anything on October 14th and 15th.[31]

¶7 Raker Resources was very proactive in trying to address these production problems. In February of 2016, Raker Resources started using more soap in its operations of the Cowan Well in an attempt to aerate the fluid and make it easier to expel.[32] Then in August, Raker Resources attempted "rocking the well" back and forth between the coil tubing and the annulus (i.e., the space between the coil tubing and the casing) to force the fluid up.[33] After September proved to be unprofitable, Raker Resources decided to move a compressor that it already owned from a nearby well to the Cowan Well in hopes that the compressor would help draw the fluid out of the wellbore.[34] Raker Resources spent just over $9,000 to transport and install the compressor.[35] On October 17th, Raker Resources shut off the Cowan Well's valve and began a two-and-a-half-week process of installing the compressor.[36] Shortly thereafter, Raker Resources sent an e-mail to Continental Resources on October 22nd saying that "our Cowan well has quit producing due to high line pressure" and that Raker Resources "ha[d] moved a compressor in to attempt to renew production."[37] Mr. Raker again asked whether "Continental Resources had any immediate plans for drilling on the unit."[38] Raker Resources brought the Cowan Well back into operation on November 4th.[39] By mid-November, the Cowan Well was back to producing 20 Mcf of gas per day,[40] which had previously been over the benchmark for profitability.[41]

¶8 Nevertheless, the Cowan Well's problems had not yet been completely resolved. In mid-November, the line pressure jumped to over 100 pounds of pressure, and the compressor never succeeded in drawing any fluid up out of the wellbore.[42] Ultimately, October, November, and December of 2016 would prove to be unprofitable for the Cowan Well.[43]

¶9 In the meantime, Tres C hired new attorneys at Andrews Davis, P.C. and became more active in pursuing termination of the Cowan Lease. On November 14th, Tres C entered into a lease option agreement with J&R Energy Resources, LLC (hereinafter "J&R Energy"), whereby J&R Energy would fund legal proceedings to secure the release, cancellation, or termination of the Cowan Lease in exchange for Tres C's promise to give J&R Energy an exclusive option to file a top lease at a later date.[44] Moreover, if J&R Energy successfully terminated the lease and exercised its option to drill, J&R Energy would pay Plaintiff a signing bonus of $3,750 per acre (which translates to $1.2 million for Tres C's 320-acre tract).[45] On November 22nd, Andrews Davis attorney Randy Smith, acting in his capacity as "agent/member" of J&R Energy, filed an Affidavit and Memorandum of Lease Option Agreement with the Blaine County Clerk's office.[46] During that same week, Randy Smith also sent DewBlaine Energy a demand letter, but in his capacity as Tres C's lawyer.[47] The letter claimed that the Cowan Lease had expired "based upon production data from the Oklahoma Tax Commission and the Oklahoma Corporation Commission," asked DewBlaine Energy to produce any evidence it possessed to the contrary, and demanded that DewBlaine Energy "remove the cloud from our clients' mineral estate by immediately releasing the Expired Lease . . . within ten (10) days from your receipt of this letter" or else Tres C would "be forced to seek a judicial determination that such lease has expired by its own terms."[48] DewBlaine Energy notified Continental Resources about the new demand letter on December 5th.[49] The very next day, Raker Resources received a telephone call from an attorney with Mahaffey & Gore, who claimed to "represent[] people who have a top-lease"--i.e., probably a reference to the entity who had a lease option, J&R Energy--on Tres C's mineral interests in Section 35-15N-13W.[50] Counsel claimed the Cowan Well's "production was down" and threatened "to take [Raker Resources] to court to force [Raker Resources] to plug the well."[51] Raker Resources promptly notified Continental Resources that afternoon about the phone call, the "top leases," and the threat of litigation.[52] Raker Resources also informed Continental Resources about the status of production at the Cowan Well and asked whether "Continental Resources would be interested in buying [Raker Resources'] interest in the well in order to fight this thing."[53] The threat of litigation made Raker Resources uncomfortable, even if it thought the Cowan Well still had the potential to produce more gas.[54]

¶10 December 6th served as a turning point for Continental Resources and its plans for Section 35-15N-13W. Continental Resources' "senses were alerted or heightened" because "you take . . . threats from Mahaffey & Gore, from that firm[,] seriously."[55] In follow-up conversations that day, Continental Resources told Raker Resources it would start having internal discussions about whether taking over the Cowan Well would make sense,[56] at which point Raker Resources made a proposal to assign 3% of its 7.5% ORR back to Continental Resources if Continental Resources could spud a new well on or before January 31, 2017.[57] What nobody except Continental Resources and DewBlaine Energy appreciated was the fact that those two entities had been taking steps since August of 2016 to drill a new well to be called the Orval #1-2-35XH well (hereinafter "the Orval Well") into Section 35 sometime in 2018--i.e., a two-mile horizontal well into the Woodford formation that would be spud in Section 2-14N-13W and that would stretch northward into Section 35-15N-13W.[58] Those steps included sending on August 5th a well proposal to Section 2's working interest owners[59]; filing on August 24th both an application for pooling in Section 2 and two applications for drilling and spacing units covering certain formations under Sections 2 and 35[60]; and obtaining on October 7th an order from the Oklahoma Corporation Commission for the drilling and spacing unit on Section 35.[61] After December 6th, however, Continental Resources began considering whether its plans could be altered for the sake of holding the leases on Section 35.

¶11 In short order, Continental Resources was able to shift its plans. On December 16th, the leader of Continental Resources' team circulated an internal e-mail laying out a plan to seek executive approval for drilling a 2-mile horizontal well by January 26, 2017.[62] Besides shifting the drilling date, the proposal altered the previous plans as follows: (1) the well would be spud in the northeast quarter (NE/4) of Section 35, rather than in Section 2; (2) drilling would extend southward into Section 2, rather than northward into Section 35; (3) the Orval Well would be renamed as the Tres C FIU #1-35-2XH well (hereinafter "the Tres C Well") because of the change in the spud location to Tres C's land; and (4) the target formation would be the Meramec/Mississippian formation, instead of the Woodford formation.[63] By shifting to a different formation, Continental Resources hoped to avoid delays caused by negotiations with DewBlaine Energy's lawyers in Houston and South Korea and delays caused by waiting for one of the joint venture's five or six drilling rigs that were needed for other projects, as a rig could instead be pulled from Continental Resources' regional STACK[64] team.[65] That same day, Continental Resources also made Raker Resources aware of its interest in the proposal that would reassign 3% of Raker Resources' 7.5% ORR back to Continental Resources, and asked Raker Resources again to send updated accounting statements,[66] which Raker Resources forwarded later that afternoon.[67] On December 21st, Continental Resources notified Raker Resources that, based on the agreed 3%-ORR assignment, its STACK team would be taking a well in for executive approval the next day with plans to spud the well in late January of 2017.[68]

¶12 Thereafter, Continental Resources took steps to get the Tres C Well drilled. On December 21st, Continental Resources staked the proposed location for the new Tres C Well in the NE/4 of Section 35-15N-13W.[69] A representative for Continental Resources met David Cowan at the site for the Tres C Well sometime in late December of 2016 or early January of 2017 to negotiate a surface damage agreement pursuant to the Oklahoma Surface Damages Act.[70] Tres C initially resisted signing any surface damage agreement;[71] but after Continental Resources filed a surface damage action on January 17, 2017,[72] Tres C's attorneys worked out a settlement that resulted in dismissal of the surface damage action.[73] On January 5th and 12th, Continental Resources authorized its STACK team to make expenditures for drilling either a multiunit well or a single-unit well in Section 35.[74] On January 6th, Continental Resources filed applications with the Corporation Commission to drill the Tres C Well as a multiunit horizontal well and to get an exception on the well's location,[75] and the OCC filed a public notice to set the matters for hearing on January 30th.[76] On January 19th, Continental Resources began moving dirt to build the drilling pad for the Tres C Well.[77] On January 27th, J&R Energy's attorneys at Mahaffey & Gore filed protests to Continental Resources' various applications pending before the Corporation Commission,[78] which bumped the hearing date to February 28th.[79] On February 3rd, Continental Resources sought an emergency hearing "because of contractual commitments and rig availability" that would allegedly require the well to be "drill[ed], test[ed], complete[d] and produce[d] . . . prior to" the new hearing date.[80] The Corporation Commission held an emergency hearing on February 17th. Based on evidence presented at the emergency hearing that the rig would arrive on or about February 27th and that Continental Resources would suffer an estimated financial loss of $29,250 per day if drilling wasn't permitted, the Corporation Commission issued an Emergency Order granting Continental Resources authority to drill, test, and complete the multiunit Tres C Well with the location exception, but withholding authority to produce the well until after the final hearing.[81] By February 17th, Continental Resources had also negotiated an acreage trade agreement that would allow them to obtain without protest a spacing unit in Section 2, such that Continental Resources could proceed with its plans to drill the multiunit well instead of a single-unit well.[82] On February 23rd, the Corporation Commission issued a Permit to Drill allowing Continental Resources to commence drilling on the Tres C Well.[83] As soon as the Corporation Commission's Emergency Orders were filed on March 9th, Continental Resources spud the Tres C Well, and the well was completed on July 29th at a cost of more than $9 million.[84]

¶13 Having seen where things were going at the Corporation Commission, J&R Energy's attorneys at Mahaffey & Gore exercised their rights under the lease option agreement and filed this equitable quiet title action on Tres C's behalf on February 27, 2017.[85] The Petition alleged that the Cowan Well had "ceased to produce in paying quantities" and that the Cowan Lease had therefore "expired by its own terms," such that a decree should be entered to terminate and cancel the Cowan Lease and Defendants/Petitioners' mineral interests and to "restrain[] and enjoin[ Defendants/Petitioners] from exercising and/or attempting to exercise any right or interest therein by reason of the Subject [Cowan] Lease."[86]

¶14 A three-day bench trial eventually ensued in September of 2019. The parties presented seventy-four exhibits and the following seven witnesses: (1) Tincy Cowan; (2) David Cowan; (3) Gary Raker; (4) Continental Resources' corporate representative, Matthew Simmons; (5) Continental Resources' former employee, Justin Crooks; (6) Tres C's expert in the field of petroleum engineering, Aaron Anderson; and (7) Defendants/Petitioners' expert in the field of petroleum engineering, J.P. Dick. Testimony regarding the Cowan Well's production was predictably split along party lines.

¶15 On one hand, Tres C argued the Cowan Well had become unprofitable such that the Cowan Lease had expired. Both of Tres C's principals relied upon their expert's purported conclusion that the Cowan Lease expired in November of 2016.[87] Yet when he was questioned, Tres C's expert testified that he was not asked to opine on whether the lease terminated.[88] Instead, he only concluded that the Cowan Well did not produce in paying quantities in September, October, or November of 2016--i.e., that it ceased to produce in paying quantities in September of 2016.[89]

¶16 On the other hand, the defense witnesses offered testimony to the effect that the Cowan Well maintained production, either through actual profitability or mere capability. Mr. Simmons testified that Continental Resources believed the Cowan Well was profitable during the months of September, October, and November of 2016.[90] Gary Raker testified that he believed the Cowan Well was a "good producer" and "a profitable well" when he received the first demand letter in April of 2016; that it was a "good, capable producing well" when he received the second demand letter in June of 2016; that it had not lost its ability to produce when he had the compressor installed in October of 2016; that even after getting the allegedly threatening phone call from J&R Energy's attorney and seeking to entice Continental Resources to drill a new well in exchange for his return of a portion of the ORR interest in December of 2016, he was "still operating the well" because he thought the well's "capabilities . . . . were the same as they always had been" and "any day that thing could burp up some fluid and go back to producing"; and that in January and February of 2017 he was "still operating [the] well" because he "still believed the well was capable of producing if we could get the producing characteristics right . . . . [and] get the formula right."[91] Mr. Crooks also testified that he believed the Cowan Lease was valid and that Raker Resources and Continental Resources still owned 100 percent of Section 35.[92] Lastly, the defense expert testified--contrary to what Tres C's expert thought--that he wouldn't consider insurance costs or the one-time expenses related to transportation and installation of the compressor to be "lifting costs" and that he also wasn't sure whether the purchaser's low-volume or "meter" fees (i.e., fees that the purchaser charges the operator when the gas produced falls below a certain volume) should be considered "lifting costs."[93] Thus, he concluded that the Cowan Well was profitable regardless of whether he looked at data for the 12-month period from December 2015 to November 2016, for the 12-month period from January 2016 to December 2016, or for the 12-month period from February 2016 to January 2017--or even at data for the 14-month period from January 2016 to February 2017 or for the 26-month period from January 2015 to February 2017.[94] The defense expert did not think the 3-month period analyzed by Tres C's expert was adequate for determining whether the Cowan Well had become unprofitable;[95] yet he also concluded that in looking at individual production months on a month-by-month basis, each production month from September of 2016 to February of 2017 was profitable except for October, November, and--depending upon whether the Court characterized the low-volume/meter fees as lifting costs--possibly September.[96] To the extent the well was unprofitable during those months, the defense expert blamed "[t]he cumulative effect of increased line pressure and pressure spikes" that caused water loading for the "reduced . . . ability of the well to produce to its capability."[97] Nevertheless, he maintained that the Cowan Well remained capable of producing in paying quantities during those three months.[98]

¶17 But beyond testimony about the Cowan Well, the defense put on evidence regarding Continental Resources' drilling of the new Tres C Well in order to bolster its claim that the Cowan Lease was still valid. Mr. Crooks painstakingly testified about all the steps that Continental Resources took toward drilling a well in Section 35, as well as the substantial resources spent on drilling the Tres C Well.[99]

¶18 Nearly four months later on January 17, 2020, the trial court issued its Journal Entry of Judgment canceling the Cowan Lease in favor of Tres C. The trial court found that "[t]he costs associated with installation of the compressor on the Cowan Well [we]re lifting costs" and that "[t]he low volume fees charged by the gas purchaser [we]re to be deducted from gross revenue in determining whether the well produces in paying quantities," but the trial court found "[t]he insurance expenses on the Cowan Well [we]re not lifting costs."[100] Consequently, when comparing the Cowan Well's net revenues and lifting costs, the trial court found that, "[b]y September 2016, the Cowan well ceased to produce in paying quantities" because "lifting costs exceeded revenues from the Cowan Well in September, 2016 and in every month after."[101] But the sweeping language about "every month after" September only refers to the subsequent two months of October and November, as demonstrated by the trial court's analysis of both experts' calculations for those months only and by its ultimate finding that "[t]he Cowan Well failed to produce in paying quantities for the production months of September, October and November of 2016."[102] Alternatively, the trial court found that the Cowan Well was shut in on October 17, 2016, after two days of no production and that a cessation of production occurred because "[t]he Cowan Well was not producing in paying quantities immediately prior to being 'shut-in' by Raker on October 17, 2016."[103] Having two bases for a cessation of production, the trial court further found that Raker Resources "did not restore production in paying quantities from the Cowan Lease within the 60 day grace period provided by the Cessation of Production Clause" and that Continental Resources "did not commence operations for the drilling of a new well on the Subject Lease during the grace period . . . . in time to perpetuate the Subject Lease under the terms of the Cessation of Production Clause" insofar as it "did not begin moving dirt for the building of the drilling pad for the new Tres C Well until January 19, 2017."[104] Thus, the Cowan Lease "expired by its own terms after the Cowan Well failed to produce in paying quantities in September, October and November of 2016."[105] Consequently, the trial court quieted title and entered judgment in favor of Tres C.[106]

¶19 All three Defendants/Petitioners jointly filed a timely appeal of the trial court's judgment on February 14, 2020.[107] In their appellate brief, Defendants/Petitioners narrowed the scope of their appeal down to two issues.[108] First, they alleged "the lower court erroneously held 'production' ceases any moment profitability is interrupted, instead of analyzing profitability over a reasonable accounting period."[109] Regarding this issue, their brief states the following:

The main issue on appeal is to determine when "production" under the Habendum Clause ceases and the 60-day savings provision of the Cessation of Production Clause begins. Plaintiff contends this occurs any moment an interruption in actual, continuous profitable production occurs -- at which point(s) a lessee must immediately choose whether to commence drilling a new well or risk forfeiting its leasehold if profitable production does not resume within the savings period. Defendants contend the Habendum Clause remains in force and maintains the lease until there is a cessation of production in paying quantities for an unreasonable period of time gauged under all the circumstances from the perspective of a reasonable operator -- so a lessee need not undertake the burden of commencing a new well every time production dips below paying quantities.[110]

Second, Defendants/Petitioners alleged the trial court erred in failing to address "whether Plaintiff's demand for release of the Subject Lease in March, 2016, and/or its repeated demand in November 2016 accompanied by its recorded top-lease" would permit them to take advantage of the obstruction doctrine by suspending operations and relieving them of their duty to produce in paying quantities until resolution of the title challenge.[111] With respect to both issues, Defendants/Petitioners claimed they were "seek[ing] review of the legal standard applied by the trial court" and that they were "not seek[ing] review of the trial court's factual determinations."[112]

¶20 This Court denied a motion to retain the appeal and instead assigned the matter to Division IV of the Court of Civil Appeals (COCA).[113] The COCA issued its opinion on June 8, 2021. Therein, the COCA avoided reaching the first issue. The COCA treated the trial court's finding that a cessation of production had occurred as a factual finding, rather than a legal conclusion, and then essentially characterized Defendants/Petitioners' assertion that they were not challenging any factual findings as a waiver of the first issue on appeal:

In their Brief at page 14, Raker and Continental stated:

Defendants do not seek review of the trial court's factual determinations in this lease cancellation suit. Defendants seek review of the legal standards applied by the trial court, including specific standards set forth in Hall v. Galmor, 2018 OK 59, 427 P.3d 1052.

The trial court made extensive fact findings, all of which are admitted and now established. . . .

. . . .

. . . The Cowan Well ceased to produce in paying quantities in September 2016 and every month thereafter. . . . The trial court specifically found that the Cowan Well failed to produce in paying quantities for September, October and November 2016.

. . . .

The Cowan Lease is clear. The facts are established and not challenged. There was a cessation of production. Raker and Continental had sixty days to remedy the cause of the cessation of production or drill a new well. They did neither. Absent an additional, noncontract related defense, the Cowan Lease expired. The trial court did not err applying the facts to the Cowan Lease contract . . . .[114]

Nevertheless, the COCA found that the trial court "left unaddressed the noncontractual defense of obstruction" and determined that the case should be remanded for the trial court to pass upon the defense as a matter of first instance.[115] Consequently, the COCA "conditionally affirmed" the trial court's judgment "on the condition that the trial court finds against the defendants on their obstruction defense on remand."[116]

¶21 On June 25, 2021, Defendants/Petitioners filed a petition for writ of certiorari, seeking this Court's review of whether the trial court erred in finding a cessation of production based upon a narrow 90-day window. This Court granted certiorari on January 31, 2022.

STANDARD OF REVIEW

¶22 This quiet title action is a matter of equitable cognizance. See Hall, 2018 OK 59, ¶ 11, 427 P.3d at 1061 (citing Smith v. Marshall Oil Corp., 2004 OK 10, ¶ 8, 85 P.3d 830, 833; Hininger v. Kaiser, 1987 OK 26, ¶ 10, 738 P.2d 137, 141; Cotner v. Warren, 1958 OK 208, ¶ 5, 330 P.2d 217, 219; Henry v. Clay, 1954 OK 170, ¶ 12, 274 P.2d 545, 548). In equitable cases like this, issues of fact are reviewable under the clearly-against-the-weight-of-the-evidence standard, but issues of law are reviewable under the de novo standard. Id. ¶¶ 12--13, 427 P.3d at 1061. Thus, factual findings "will not be set aside unless, after a consideration of the entire record, it appears that such findings are clearly against the weight of the evidence." Id. ¶ 12, 427 P.3d at 1061 (quoting Briggs v. Sarkeys, Inc., 1966 OK 168, ¶ 29, 418 P.2d 620, 624). But we possess "plenary, independent, and non-deferential authority to reexamine a trial court's legal rulings." Id. ¶ 13, 427 P.3d at 1061 (quoting State ex rel. Dep't of Human Servs. v. Baggett, 1999 OK 68, ¶ 4, 990 P.2d 235, 238).

ANALYSIS AND REVIEW

¶23 The issue before this Court is whether it was legal error for the trial court to apply a rule of law that analyzed only a 3-month window of time for assessing whether the Cowan Well had experienced a cessation of production in paying quantities such that the Cowan Lease expired by its own terms. Stated more broadly, the issue concerns how to determine whether production that maintains a gas lease under the habendum clause has ceased, including whether the cessation-of-production clause plays any role in narrowing the window of time that should be considered in making such a determination.

¶24 Defendants/Petitioners contend that "whether a well remains capable of production and thus perpetuates the lease under the habendum clause is assessed over a reasonable look-back period of time sufficient to consider whether a prudent operator would continue or abandon operations."[117] They argue that the 60-day savings period in the Cowan Well's cessation-of-production clause does not come to bear until a longer look-back period (the length of which can only be gauged in light of all the equitable circumstances) demonstrates that a cessation--not merely an interruption--of profitable production has occurred.[118] Otherwise, "the savings period of a cessation of production clause is always engaged, so that a lessee must constantly evaluate the need to commence a new well to save its lease upon every interruption of profitable production" and must "constantly monitor production on a daily basis and be prepared to take action if production from any single day resulted in a loss"--a tenet which Defendants/Petitioners characterize as "contrary to Oklahoma law, and wholly unworkable for the oil and gas industry" insofar as it "imposes new, economically unworkable burdens on the Oklahoma oil and gas industry."[119] To the extent that the COCA failed to address this issue of law on appeal, Defendants/Petitioners argue its opinion affirming the trial court's judgment "disregard[ed] this Court's precedents" in Stewart v. Amerada Hess Corp., Pack v. Santa Fe Minerals, and Hall v. Galmor[120]; was "contrary to the preeminent treatise on oil and gas law regularly relied upon by this Court"[121]; and was in conflict with Blair v. Natural Gas Anadarko Co., 2017 OK CIV APP 57, 406 P.3d 580.[122]

¶25 Tres C counters that this Court cannot endorse Defendants/Petitioners' "reasonable look-back period" because the Cowan Lease's bargained-for cessation-of-production clause controls over the common law temporary cessation doctrine and gives Defendants/Petitioners only 60 days in which to restore production in paying quantities.[123] Tres C argues that Defendants/Petitioners "seek to overturn decades of this Court's precedent" and point us to the cases of Hoyt v. Continental Oil Co., French v. Tenneco Oil Co., and Hall v. Galmor.[124] Tres C also attempts to distinguish the Pack and Blair cases on the basis that the parties therein had stipulated the wells at issue were capable of production in paying quantities, whereas the Cowan Well's capability was disputed.[125] Thus, according to Tres C, the "COCA correctly rejected [Defendants/Petitioner]s' arguments, and instead, based on the applicable teachings of Hoyt, French, and Hall found that the lease had expired pursuant to its terms due to a cessation of commercial production far in excess of 60 days."[126]

¶26 Upon de novo review of the parties' proffered cases and arguments concerning this legal issue, we conclude that the trial court erred in determining that a cessation of production occurred based on Tres C's evidence that the Cowan Well was unprofitable for the three months of September, October, and November of 2016. Even if all the evidence--including the testimony of Tres C's expert, the calculations of the defense expert, and the admission of the operator, Gary Raker-- tends to show that the Cowan Well was operating at a loss during those three months, that period of time is, as a matter of law, too short for determining whether a cessation of production in paying quantities has occurred.

¶27 Tres C's and the trial court's reliance upon the cessation-of-production clause to establish a 3-month time period for assessing whether the well has lost its profitability such that a "cessation" has occurred is misplaced for several reasons.

¶28 First, we have repeatedly explained that the cessation-of-production clause is only implicated where production has already ceased--i.e., the clause only comes into play after a cessation has occurred. See Hall, 2018 OK 59, ¶ 36, 427 P.3d at 1068; Pack, 1994 OK 23, ¶ 16, 869 P.2d at 328; accord 4 Kuntz, supra note 121, § 47.3(a)(1) (discussing the "[p]urpose and effect" of a cessation-of-production clause and stating "the clause is not activated and the prescribed period within which operations must be commenced does not begin to run until production in paying quantities has ceased under the test applied to the habendum clause"); 2 Kuntz, supra note 121, § 26.6 ("[I]f the 'production' requirement of the habendum clause is met, the cessation-of-production clause is not triggered." (citing Hall, 2018 OK 59, ¶ 36, 427 P.3d at 1068)). That is why we have repeatedly characterized the cessation-of-production clause as a "savings clause" that defines the grace period for reestablishing production in paying quantities through the means specified within the clause (e.g., the commencement of drilling operations for a new well, the commencement of operations to rework an old well, etc.). Hall, 2018 OK 59, ¶¶ 35--36 & n.84, 427 P.3d at 1067--68 & n.84; Pack, 1994 OK 23, ¶ 16, 869 P.2d at 328; French, 1986 OK 22, ¶ 8, 725 P.2d at 277 (quoting Hoyt, 1980 OK 1, ¶ 10, 606 P.2d at 563). Like a savings statute that kicks in after the applicable statute of limitations has expired and gives the plaintiff an extension of time for refiling a lawsuit, see, e.g., 12 O.S.2011, § 100,[127] the cessation-of-production clause kicks in after a cessation has occurred that could result in termination of an oil and gas lease under the habendum clause and gives the operator an extension of time for preserving the lease through the means specified in the clause. Therefore, the cessation-of-production clause and the 60-day time period contained therein have no bearing on anything that is done before the cessation occurs, including the assessment of whether a cessation has occurred.

¶29 Second, we agree with Defendants/Petitioners and their treatise that "[i]t is not the purpose of the cessation of production clause to establish an accounting period for purposes of determining if production is in paying quantities." 4 Kuntz, supra note 121, § 47.3(a)(1); accord Clifton v. Koontz, 325 S.W.2d 684, 690 (Tex. 1959) (" . . . however, if production never ceased, as is the case here, the 60-day clause is not definitive of the period over which the trier of the facts must determine whether a lease is producing in paying quantities"). Otherwise, leasehold operators subject to a 60-day cessation-of-production clause (like Defendants/Petitioners) would be required to commence drilling operations immediately upon sustaining a slight loss for one month without regard to whether they believed the next month's production might be profitable, because another month of slight loss could result in forfeiture of the lease. Such a result would be wholly unworkable in the oil and gas industry. Furthermore, if this Court used the cessation-of-production clause to establish a 3-month accounting period, we would indubitably burden leasehold operators with a duty to market continually in order to maintain the profitable production necessary to sustain the lease. Yet this Court rejected the imposition of such a duty under the cessation-of-production clause in the Pack case:

The lessors/mineral interest owners argue the term "production" used in this [cessation-of-production] clause includes removal and marketing of the product. They would require the lessee to continually market the gas from the well, and any cessation of such marketing for a period of sixty days or more would result in termination of the lease. We cannot accede to such a constrained construction of the clause as it discounts the intended meaning of production as this Court has determined in numerous cases. . . .

. . . If we were to conclude that the term "production" as used in the cessation of production clause means removal and marketing of the product as the mineral interest owners assert, . . . . [a]ny cessation of marketing for a sixty day period, under the lessors' interpretation of the clause, would constitute a violation of the clause resulting in termination of the lease. Such a result ignores the express terms of the habendum clause which provide for the lease to continue after the primary term as long as the well is capable of production in commercial quantities regardless of marketing.

. . . .

Thus, the clause does not require the lessee to market oil or gas actually extracted from the well. If the well was capable of production in commercial quantities at all times, but for a short period had less than commercial quantities marketed from it, the lessors would require the lessees to begin drilling operations for another well that under the facts would be unnecessary and uneconomical.

Pack, 1994 OK 23, ¶¶ 14--15, 17, 869 P.2d at 327--29; see also Voiles v. Santa Fe Minerals, Inc., 1996 OK 13, ¶¶ 9--10, 911 P.2d 1205, 1208--09 (stating that the Pack case explained "that a lease capable of producing in paying quantities will not terminate under that [i.e., the cessation-of-production] clause for a failure to market gas for a sixty-day period" and concluding that there was no appetite for overruling Pack). Thus, in order to avoid unwanted results, we must steer clear of using the cessation-of-production clause to define a specific accounting period for determining whether production has been in paying quantities.

¶30 Instead, our case law provides that, when an appellate court is reviewing whether "the period employed by the trial court to determine profitability was sufficient," "the appropriate time period is not measured in days, weeks or months, but by a time appropriate under all of the facts and circumstances of each case." Barby v. Singer, 1982 OK 49, ¶ 6, 648 P.2d 14, 16--17; accord Texaco, Inc. v. Fox, 618 P.2d 844 (Kan. 1980) (observing that "it is generally accepted that profitability on an oil and gas lease should be determined over a relatively long period of time in order to expose the operation to the leveling influences of time," discussing the downfalls of using time periods that are too short or too long, and holding that "[t]he better rule precludes the use of a rigid fixed term for determination of profitability and uses a reasonable time depending upon the circumstances of each case, taking into consideration sufficient time to reflect the current production status of the lease"); Clifton v. Koontz, 325 S.W.2d 684, 690 (Tex. 1959) (stating that "there can be no limit as to time, whether it be days, weeks, or months, to be taken into consideration in determining the question of whether paying production from the lease has ceased" and saying that "the trial court necessarily must take into consideration all matters which would influence a reasonable and prudent operator," including "a reasonable period of time under the circumstances"); see also 2 Kuntz, supra note 121, § 26.7(u) (generally discussing the "[p]eriod of time taken into account" for determining "[w]hat constitutes paying quantities"). This Court has repeatedly approved the use of reasonably lengthy accounting periods in assessing the profitability of a well's production. In the case of Barby v. Singer, 1982 OK 49, 648 P.2d 14, this Court affirmed the trial court's use of a 14-month period to assess profitability. Id. ¶ 6, 648 P.2d at 16. In the case of Smith v. Marshall Oil Corp., 2004 OK 10, 85 P.3d 830, this Court found that the 3-year "period employed by the trial court in the instant case, to measure the Stacy and Paige wells' profitability, was sufficient under all the facts and circumstances for a fair and reasonable determination." Id. ¶¶ 11, 14, 85 P.3d at 834--35. In the case of Henry v. Clay, 1954 OK 170, 274 P.2d 545, this Court considered the subject well's production over a 32-month period--or as Defendants/Petitioners' proffered treatise characterized it, "the entire productive history of the lease," see 2 Kuntz, supra note 121, § 26.7(u) & n.85--and found that a $46.15 deficit was no reason for "forfeit[ure] of his [i.e., the operator's] entire investment therein" simply because "the total cost of production at any particular time slightly exceed[ed] the actual returns to him." Henry, 1954 OK 170, ¶ 11, 274 P.2d at 547--48. Each of these cases demonstrate that the reasonable amount of time needed for assessing a well's profitability and for determining whether a cessation has occurred is typically much longer than 3 months.

¶31 Tres C argues that language from the Hoyt, French, and Hall cases mandates the time period set forth in the cessation-of-production clause will override any common-law requirement to utilize a reasonable time period. The language at issue states:

Where the parties have bargained for and agreed on a time period for a temporary cessation clause that provision will control over the common law doctrine of temporary cessation allowing a "reasonable time" for resumption of drilling operations,

Hoyt, 1980 OK 1, ¶ 10, 606 P.2d at 563--64 (emphasis added), quoted in French, 1986 OK 22, ¶ 7, 725 P.2d at 277, and:

[A]ppellants contend that a determination of cessation of production paying quantities is dependent upon the selection of a proper time frame within which to base that calculation. Intertwined with these points is the contention that the 60-day period for resumption of operations specified in the lease does not become activated until the expiration of a reasonable period of time, thus giving the lessee a reasonable time to resume operations plus 60 days. Appellants' contention that a 60-day cessation clause is time in addition to a reasonable time for resumption of drilling is not well taken in light of the express language of Hoyt v. Continental Oil, supra, at p. 563,

French, 1986 OK 22, ¶ 7, 725 P.2d at 276--77 (emphasis added), and:

Where the law (by operation of the temporary cessation doctrine) would ordinarily give a lessee a "reasonable" amount of time in which to restore production, the cessation-of-production clause substitutes a bargained-for period of time that cannot be altered by any court's notion of reasonableness.

Hall, 2018 OK 59, ¶ 35, 427 P.3d at 1067 (emphasis added). Tres C assumes that the "reasonable amount of time" that is permitted under the temporary cessation doctrine encompasses both the period of time that a court would look at to assess whether a cessation has occurred and the period of time allowed for resumption of operations after the cessation has occurred. Thus, by extension, Tres C wants this Court to recognize the cessation-of-production clause as a substitute for both periods of time, thereby limiting the period of time for assessing profitability to 60 days and, in the event such circumscribed data demonstrates unprofitability, leaving no time for resumption of drilling operations.

¶32 Such arguments are unconvincing for three reasons.

¶33 First, the quoted language from Hoyt, French, and Hall undermines Tres C's position insofar as it discusses the time "for resumption of drilling operations" or for "restor[ation of] production." The language clearly presupposes that a cessation has already occurred; otherwise there would be no need to resume drilling or reworking. Nothing illustrates this more clearly than the quoted language from the French case, where the Court characterized the issue before it in terms of whether the lessee would receive "a reasonable time . . . plus 60 days" in order "to resume operations." The French Court did not characterize the issue in terms of whether the lessee would have a reasonable time to assess profitability and then, if the well proved unprofitable such that production had ceased, get 60 days more to resume operations--which is the issue in this case. Looking at the quoted language alone, it would seem that both the cessation-of-production clause and the temporary cessation doctrine only come into play after a cessation has occurred. The name of the doctrine also bolsters the notion that it is triggered by a "cessation," albeit a "temporary" one. Thus, neither the cessation-of-production clause nor the temporary cessation doctrine have anything to do with the reasonable time period that governs the pre-cessation assessment of profitability.

¶34 Second, despite the quoted language from the Hoyt, French, and Hall cases, the cessation-of-production clause was never designed to eliminate or to avoid the operation of the temporary cessation doctrine as Tres C argues. Defendants/Petitioners' proffered treatise perhaps says it best:

It is possible for the literal provisions of the various forms of the dry hole clause and cessation of production clause to be construed to prevent the application of the doctrine of temporary cessation of production. The period of time within which operations must be commenced has been treated as a contractual definition of temporary cessation [citing Hoyt and French, along with cases from other jurisdictions]. . . .

. . . .

An indiscriminate application of such rule can, however, lead to results that the parties were not likely to have intended when they included such a clause in the lease. A typical clause that combines the dry hole clause and cessation of production clause may vary as to the period of time allowed, but it will contain language that is the same or similar to the following language:

"If prior to the discovery oil or gas, lessee should drill a dry hole or holes thereon, or if after the discovery of oil or gas in paying quantities, the production thereof should cease from any cause, this lease shall not terminate if the lessee commences additional drilling or reworking operations within thirty days thereafter or (if it should be in the primary term) commences additional drilling operations or resumes the payment of rentals. . . ."

The fact that the event which is designed to prevent termination is the commencement of drilling or reworking operations gives some indication of the purpose of the clause and the intention of the parties. It indicates that the parties are concerned with a situation where cessation of production is of the type that is remedied by drilling or reworking operations. Thus, the parties must have intended that the clause would become operative if a dry well is drilled or if a producing well ceases to be capable of producing in paying quantities. A literal application of the clause to every temporary cessation of production could lead to absurd results.

Thus, if the marketing of production should be interrupted because of a rupture of the purchaser's pipeline, it is not likely that the parties intended that the lease could be preserved only by commencing drilling or reworking operations on the lease, when such operations would not correct the difficulty. The problem is not a great one in a jurisdiction such as Oklahoma, where marketing is not required for production, because, by definition, production would not have ceased. . . .

The doctrine of temporary cessation of production is a practical necessity, because oil and gas are never produced and marketed in a continuous, uninterrupted operation that goes on every hour of the day and night. Once it is recognized that any brief interruption in the operation must be tolerated as a practical matter, it becomes necessary to adopt a doctrine that permits temporary cessations of production. The resumption of operations clause [i.e., a short-hand reference to the combined dry hole clause and cessation-of-production clause] was never designed to eliminate or to avoid the operation of such doctrine or to require that oil or gas be produced and marketed in a continuous, uninterrupted operation. It was intended to preserve a lease in order to permit a lessee to restore production if production should cease under circumstances that require drilling or reworking on his part in order to restore production. Accordingly, it would be more reasonable to construe the resumption of operations clause so that the clause "or if after the discovery of oil or gas in paying quantities, the production thereof should cease from any cause" refers not to the temporary cessation of production, but to a cessation of production that would be permanent unless corrected by reworking or drilling operations.

2 Kuntz, supra note 121, § 26.13(b) (emphasis added) (footnotes omitted); see also 4 Kuntz, supra note 121, § 47.3(a) ("It is submitted that, regardless of the location of the clause, it would be more reasonable to construe the cessation of production clause so that the provision 'or if after the discovery of oil or gas in paying quantities the production thereof should cease from any cause' refers not to a temporary cessation of production but to a cessation of production that would be permanent unless corrected by reworking or drilling operations."). In the case before us, the event which can prevent termination under the Cowan Lease's cessation-of-production clause is the "resum[ption of] operations for drilling a well within sixty (60) days from such cessation."[128] This indicates that the parties intended the clause to become operative only if the "cessation" was permanent, as only a permanent cessation would require the remedy of drilling a new well. But Tres C argues in favor of utilizing the clause under very different circumstances, where the operator, Raker Resources, was still in the process of testing whether the Cowan Well's pressure and fluid build-up problems could be remedied by the installation of a compressor or by the downhole utilization of more soap.[129] Such a temporary interruption in profitable production should not trigger the 60-day time limit in the cessation-of-production clause--particularly insofar as that clause was really designed to provide a grace period for protecting Defendants/Petitioners' leasehold interests, see supra ¶ 28, and in light of the strong policy of our statutory law against forfeiture of estates as embodied in 23 O.S.2011, § 2, see Stewart v. Amerada Hess Corp., 1979 OK 145, ¶ 10, 604 P.2d 854, 858. Additionally, even if our rule requiring us to look at a reasonable time period when determining profitability did emanate from the temporary cessation doctrine--which it does not--the cessation-of-production clause's 60-day time limit need not serve as a basis for eliminating or avoiding the reasonable time period.

¶35 Lastly, Tres C's reliance upon the Hoyt and French cases is misguided insofar as this Court has previously distinguished those cases in a way that limits their applicability to situations where the subject wells are incapable of producing when the primary term of the lease expires and are thus unable to produce during the secondary term. See Pack, 1994 OK 23, ¶ 18, 869 P.2d at 329. As the Cowan Well was producing far into the secondary term of the Cowan Lease and was arguably still capable of production in paying quantities, Hoyt and French are inapposite.

CONCLUSION

¶36 We conclude the trial court erred when it relied upon the cessation-of-production clause to establish a 3-month time period for assessing whether a cessation of production in paying quantities had occurred.

¶37 The judgment of the trial court is reversed. Had the trial court applied the appropriate rule of law and analyzed the Cowan Well's profitability over "a time [period] appropriate under all of the facts and circumstances," Barby, 1982 OK 49, ¶ 6, 648 P.2d at 16--17, judgment should have been entered in favor of Defendants/Petitioners by reason of Plaintiff's failure to carry their burden of proof. The evidence presented and relied upon by the trial court established that the Cowan Well was not producing in paying quantities for a period of three months,[130] but three months is not an appropriate time period under all of the facts and circumstances of this case, particularly in light of the operator's efforts to remedy the dip in production.[131] An additional basis to reverse the trial court's judgment arises from its back-dating the erroneously found cessation to September 1, 2016,[132] which effectively served to deprive Defendants/Petitioners of the 60-day grace period afforded in the cessation-of-production clause. Any cessation would have commenced on December 1, 2016, at the close of the three-month period used to assess profitability; and Continental Resources' commencement of drilling operations on January 19, 2017, would have maintained the Cowan Lease under the cessation-of-production clause. Despite the fact that the cessation-of-production clause has no bearing on the accounting period, the facts of this case demonstrate that the goal of that clause was realized when Continental Resources drilled a more productive well. Production benefits the operator (Continental Resources), the overriding royalty owner (Raker Resources), and the royalty owner (Tres C); and that goal has been accomplished. We hereby quiet title in favor of Defendants/Petitioners Raker Resources, LLC; Continental Resources, Inc.; and DewBlaine Energy, LLC. Because we vacate the Court of Civil Appeals' opinion and reverse the trial court's judgment, the trial court need not address the noncontractual defense of obstruction as that issue is now moot.

OPINION OF THE COURT OF CIVIL APPEALS VACATED;
JUDGMENT OF THE TRIAL COURT REVERSED;
CASE REMANDED FOR FURTHER PROCEEDINGS 
NOT INCONSISTENT WITH THIS OPINION.

KANE, C.J., and KAUGER, WINCHESTER, EDMONDSON, COMBS, GURICH, DARBY, and KUEHN, JJ., concur.

ROWE, V.C.J., concurs in result.

FOOTNOTES

[1] ROA p.000595, Trial Tr. vol. I, 41:25--42:7, Sept. 24, 2019; ROA p.000573, Journal Entry of J. ¶ 1, at 1.

[2] ROA p.000595, Trial Tr. Vol. I, 42:8--44:21; ROA p.000573, Journal Entry of J. ¶ 2, at 1.

[3] ROA p.000598, Jt. Trial Ex. 117, Oil & Gas Lease 1; ROA pp.000573--000574, Journal Entry of J. ¶ 4, at 1--2.

[4] ROA p.000598, Jt. Trial Ex. 117, Oil & Gas Lease ¶ 2, at 1; ROA p.000574, Journal Entry of J. ¶ 8, at 2.

[5] ROA p.000598, Jt. Trial Ex. 117, Oil & Gas Lease ¶ 13, at 1 (emphasis added); see also ROA p.000574, Journal Entry of J. ¶ 9, at 2 (quoting only the second sentence).

[6] Id., Jt. Trial Ex. 1, Okla. Corp. Comm'n Well Record (Form 1002A) 1; ROA p.000596, Trial Tr. vol. II, 239:4--:17 (testimony of defense expert J.P. Dick); ROA p.000574, Journal Entry of J. ¶ 5, at 2.

[7] ROA p.000573, Journal Entry of J. ¶ 4, at 1.

[8] ROA p.000598, Jt. Trial Ex. 2, Transfer of Operator (Form 1073) 1; ROA p.000595, Trial Tr. vol. I, 83:3--84:4 (testimony of Gary Raker).

[9] See ROA p.000595, Trial Tr. vol. I, 84:5--:21 (testimony of Gary Raker); ROA p.000596, Trial Tr. vol. II, 41:11--:14, Sept. 25, 2019 (testimony of Continental Resources' corporate representative, Matthew Simmons); ROA p.000574, Journal Entry of J. ¶ 7, at 2.

[10] See ROA p.000595, Trial Tr. vol. I, 85:2--:4 (testimony of Gary Raker).

[11] See ROA p.000574, Journal Entry of J. ¶ 6, at 2.

Incidentally, after the writ of certiorari was granted in this appeal, Tres C filed a Notice of the G.D. Cowan #1 Well Plugging on February 18, 2022. Therein, Tres C informs this Court that Raker Resources has "plugged and abandoned the Cowan Well" and attaches a Plugging Record (Form 1003) that Gary Raker filed with the Oklahoma Corporation Commission on April 15, 2021. Notice of G.D. Cowan #1 Well Plugging 1 & ex. 1. Thus, it appears that Raker Resources is not currently operating the Cowan Well. Nevertheless, this was an improper attempt to supplement the record on appeal with information that was not presented to the trial court or the Court of Civil Appeals, and Tres C's Notice has been stricken by separate order filed concurrently with this opinion.

[12] See ROA p.000596, Trial Tr. vol. II, 42:15--43:4 (testimony of Matthew Simmons).

[13] See id. at 147:19--:25 (testimony of Matthew Simmons).

[14] See id. at 98:19--99:12 (testimony of Gary Raker); ROA p.000598, Jt. Trial Ex. 125, J.P. Dick's Production Graph 1 (depicting a steady decline in the Cowan Well's production from 6 Mcf per day in late 2007 to 1.5 Mcf per day in March 2009).

[15] See ROA p.000596, Trial Tr. vol. II, 99:7--100:2 (testimony of Gary Raker).

[16] See id. at 99:7--100:2 (testimony of Gary Raker); id. at 241:4--:17 (testimony of defense expert J.P. Dick); ROA p.000598, Jt. Trial Ex. 125, J.P. Dick's Production Graph 1 (showing that production increased from 1.5 Mcf per day to anywhere between 28 Mcf and 50 Mcf for the remainder of 2009).

[17] See ROA p.000595, Trial Tr. vol. I, 44:22--45:4 (testimony of Tincy Cowan).

[18] ROA p.000598, Jt. Trial Ex. 109, Letter from Mart Tisdal, Tisdal & O'Hara, to Raker Res., LLC 1 (Mar. 30, 2016); ROA p.000574, Journal Entry of J. ¶ 11, at 2.

[19] See ROA p.000595, Trial Tr. vol. I, 87:25--90:21 (testimony of Gary Raker); ROA p.000596, Trial Tr. vol. II, 79:2--80:24, 120:10--122:18 (testimony of Gary Raker); ROA pp.000574--000575, Journal Entry of J. ¶ 12, at 2--3.

[20] ROA p.000598, Jt. Trial Ex. 111, Letter from Gary Raker, Raker Res., LLC, to Mart Tisdal, Tisdal & O'Hara 1--2 (Apr. 11, 2016).

[21] See id. (showing production amounts for January to November of 2015 that ranged from 677 Mcf to 891 Mcf, then a dip in December of 2015 to 432 Mcf, then a rebound to 752 Mcf and 589 Mcf in the first two months of 2016; but also showing similar dips in 2013 and 2014); ROA p.000574, Journal Entry of J. ¶ 10, at 2.

[22] ROA p.000598, Jt. Trial Ex. 68, E-mail from Gary Raker, Raker Res., LLC, to Michael Schooley, Cont'l Res., Inc., 1 (Apr. 28, 2016, 12:10 PM); ROA p.000575, Journal Entry of J. ¶ 13, at 3.

[23] ROA p.000598, Jt. Trial Ex. 112, Letter from Luke Adams, Tisdal & O'Hara, to Gary Raker, Raker Res., LLC, 1 (June 14, 2016) (emphasis added).

[24] Id., Jt. Trial Ex. 76, E-mail from Gary Raker, Raker Res., LLC, to Jay Buckley, Cont'l Res., Inc. 3--4 (July 15, 2016, 6:59 AM).

[25] Id., Jt. Trial Ex. 113, Letter from Gary Raker, Raker Res., LLC, to Luke Adams, Tisdal & O'Hara 1--26 (July 18, 2016).

[26] Id. at 4.

[27] See, e.g., id., Jt. Trial Ex. 6, Raker Res. Gauge Sheets 8--12 (showing the production of 3 barrels of water in January of 2016, 3 barrels in February, nearly 2 barrels in June, 10 barrels in July, 13 barrels in August, and 5 barrels in September and also showing line pressure (LP) readings for May through September of 2016 mostly in the 30- to 40-pound range with occasional spikes in the 80- to 100-pound range).

[28] See id., Jt. Trial Ex. 71, E-mails between Gary Raker, Raker Res., LLC, and Michael Schooley, Cont'l Res., Inc., 2 (Oct. 21, 2016, 11:04 AM) (wherein Mr. Raker attributed the problem "to high line pressure" that "may be due to new wells nearby packing the line"); ROA p.000596, Trial Tr. vol. II, 88:11--92:15 (wherein Mr. Raker testified during Defendants/Petitioners' case-in-chief that "we did see 80-pound line pressure there the first of the month" of September and "whenever I see production -- especially on this well -- production gradually going down, you think liquid loading, at least that's my working hypothesis"); ROA p.00595, Trial Tr. Vol. I, 95:13--:19, 106:4--:16 (wherein Mr. Raker testified during Plaintiff/Respondent's case-in-chief that "part of . . . [his] assumption or [his] theory" for the Cowan Well's low production was "high line pressure in the area" and "part of [his] theory of what was the problem is that liquid loading").

[29] See id., Jt. Trial Ex. 5, Raker Res. Jt. Interest Billings 11 (showing production of only 286 Mcf and a negative net revenue).

[30] See ROA p.000598, Jt. Trial Ex. 6, Raker Res. Gauge Sheets 13.

[31] See id., Jt. Trial Ex. 8, Enable Gathering & Processing, LLC's Gas Volume Statement 61 (showing gas production for 10/15/2016 and 10/16/2016 of 0 Mcf); id., Jt. Trial Ex. 6, Raker Res. Gauge Sheets 13 (showing gas production on October 15 and 16 of 7 Mcf and 2 Mcf, respectively); ROA p.000595, Trial Tr. vol. I, 112:10--113:19 (testimony of Gary Raker).

[32] See ROA p.000598, Jt. Trial Ex. 5, Raker Res. Jt. Interest Billings 8--13 (showing expenses for "SOAP" or "KEL-TECH" or "FOAMER" for February, March, April, May, July, September, October, and November).

[33] See id., Jt. Trial Ex. 6, Raker Res. Gauge Sheets 11 (showing notes that the flow of pressure was "Switched [to the] Casing Side" and then back "To Coil Tubing" on August 22nd and 23rd).

[34] See ROA p.000596, Trial Tr. vol. II, 92:23--93:20 (testimony of Gary Raker).

[35] See ROA p.000598, Jt. Trial Ex. 5, Raker Res. Jt. Interest Billings 12; see also id., Jt. Trial Ex. 10, Invoices for the Cowan Well 13--22 (showing the several invoices that correlate to the expenses listed on the joint interest billings).

[36] ROA p.000596, Trial Tr. vol. II, 94:21--95:17 (testimony of Gary Raker); ROA p.000577, Journal Entry of J. ¶ 30, at 5.

[37] ROA p.000598, Jt. Trial Ex. 71, E-mails between Gary Raker, Raker Res., LLC, and Michael Schooley, Cont'l Res., Inc., 2 (Oct. 22, 2016, 11:04 AM).

[38] Id.

[39] ROA p.000596, Trial Tr. vol. II, 95:16--:20 (testimony of Gary Raker).

[40] ROA p.000598, Jt. Trial Ex. 6, Raker Res. Gauge Sheets 14.

[41] See ROA p.000596, Trial Tr. vol. II, 95:20--96:1, 97:18--:23 (wherein Gary Raker testified that production "was not as good as we hoped" when the Cowan Well was first brought back online, but "they finally got it lined out there towards the middle of the month there. [November] 16th they got -- brought it back on over 20 a day . . . . which was encouraging, you know. It was kind of back up to where it was").

[42] See id. at 96:2--:9, 97:24--98:2 (testimony of Gary Raker).

[43] See ROA p.000598, Jt. Trial Ex. 5, Raker Res. Jt. Interest Billings 12--13 (showing negative "Net Cash" amounts for October and December and showing a positive "Net Cash" amount for November only because of some creative accounting whereby a $749.68 expense from October was credited back so that it could be spread out over several months, which credit had the effect of negating all other expenses and even contributing an additional amount towards revenue).

[44] See id., Jt. Trial Ex. 114, Letter from Edward Voda, J&R Energy Res., LLC, to Viola Cowan, Tres C, LLC, 1 (Nov. 14, 2016). Interestingly, the address on J&R Energy's letterhead matches the return address on the Andrews Davis law firm's letterhead. Compare id., with id., Jt. Trial Ex. 115, Letter from Randy C. Smith, Andrew Davis, to DewBlaine Energy, LLC 1--2 (Nov. 16, 2016).

[45] Id., Jt. Trial Ex. 114, Letter from Edward Voda, J&R Energy Res., LLC, to Viola Cowan, Tres C, LLC, 1 (Nov. 14, 2016); see also ROA p.000595, Trial Tr. vol. I, 47:13--48:15, 52:21--54:14, Sept. 24, 2019 (wherein Tincy Cowan testified about this agreement, providing some of the redacted details, and testified that J&R did "perform under this contract").

[46] ROA p.000598, Jt. Trial Ex. 116, Aff. & Mem. Of Lease Option Agmt. 1.

[47] Id., Jt. Trial Ex. 115, Letter from Randy C. Smith, Andrew Davis, to DewBlaine Energy, LLC 1 (Nov. 16, 2016).

[48] Id. at 1--2.

[49] Id., Jt. Trial Ex. 77, E-mail from Jongsoo "Vincent" Kim, DewBlaine Energy, LLC, to Justin Crooks, Cont'l Res., Inc., 2 (Dec. 5, 2016, 6:15 PM).

[50] Id., Jt. Trial Ex. 74, E-mail from Gary Raker, Raker Res., LLC, to Michael Schooley, Cont'l Res., Inc., 1 (Dec. 6, 2016, 4:02:27 PM); see also ROA p.000596, Trial Tr. vol. II, 101:21--105:22 (testimony of Gary Raker). According to the entries of appearance filed in this appeal, the lawyer who placed the phone call now works for a different law firm; the lawyer represented Tres C until March 26, 2020, when this Court granted a motion to withdraw as counsel of record.

[51] ROA p.000598, Jt. Trial Ex. 74, E-mail from Gary Raker, Raker Res., LLC, to Michael Schooley, Cont'l Res., Inc., 1 (Dec. 6, 2016, 4:02:27 PM); ROA p.000596, Trial Tr. vol. II, 104:20--:21 (testimony of Gary Raker).

[52] ROA p.000598, Jt. Trial Ex. 74, E-mail from Gary Raker, Raker Res., LLC, to Michael Schooley, Cont'l Res., Inc., 1 (Dec. 6, 2016, 4:02:27 PM).

[53] Id.

[54] ROA p.000596, Trial Tr. vol. II, 107:11--108:07 (testimony of Gary Raker).

[55] Id. at 191:16--:23 (testimony of Continental Resources' former employee, Justin Crooks).

[56] ROA p.000598, Jt. Trial Ex. 79, E-mail from Justin Crooks, Cont'l Res., Inc., to Gary Raker, Raker Res., LLC, 2 (Dec. 6, 2016, 5:16 PM).

[57] Id., Jt. Trial Ex. 79, E-mail from Gary Raker, Raker Res., LLC, to Justin Crooks, Cont'l Res., Inc., 1--2 (Dec. 6, 2016, 11:33 PM).

[58] See ROA p.000596, Trial Tr. vol. II, 59:10--61:19 (testimony of Matthew Simmons); id. at 149:13--155:17 (same); id. at 191:24--192:7 (testimony of Justin Crooks).

[59] ROA p.000598, Jt. Trial Ex. 23, August 5, 2016 Well Proposal.

[60] Id., Jt. Trial Ex. 24, Appl. 1--2, In re Appl. of Cont'l Res., Inc. for Pooling in Section 2-14N-13W, Cause CD No. 201603738 (Okla. Corp. Comm'n Aug. 24, 2016); id., Jt. Trial Ex. 25, Appl. 1, In re Appl. of Cont'l Res., Inc. to Establish 640-Acre Drilling & Spacing Unit in Section 2-14N-13W, Cause CD No. 201603737 (Okla. Corp. Comm'n Aug. 24, 2016); id., Jt. Trial Ex. 26, Appl. 1, In re Appl. of Cont'l Res., Inc. to Establish 640-Acre Drilling & Spacing Unit in Section 35-15N-13W, Cause CD No. 201603739 (Okla. Corp. Comm'n Aug. 24, 2016).

[61] Id., Jt. Trial Ex. 28, Order of the Comm'n 1--2, In re Appl. of Cont'l Res., Inc. to Establish 640-Acre Drilling & Spacing Unit in Section 35-15N-13W, Cause CD No. 201603739 (Okla. Corp. Comm'n Oct. 7, 2016).

[62] Id., Jt. Trial Ex. 78, E-mail from Jeff Cook, Cont'l Res., Inc., to Trent Guinn et al., Cont'l Res., Inc., 1--2 (Dec. 16, 2016, 2:41 PM).

[63] Id.; see also ROA p.000596, Trial Tr. vol. II, 68:20--72:16 (testimony of Matthew Simmons); id. at 195:3--:12, 197:2--:20 (testimony of Justin Crooks).

[64] STACK is a regional term used to reference the Sooner Trend oil field in the Anadarko basin, which is located primarily in Canadian and Kingfisher Counties. It also covers portions of Blaine County, including Section 35-15N-13W.

[65] See ROA p.000596, Trial Tr. vol. II, 193:13--194:4, 201:11--:16, 207:1--:15 (testimony of Justin Crooks).

[66] ROA p.000598, Jt. Trial Ex. 79, E-mail from Justin Crooks, Cont'l Res., Inc., to Gary Raker, Raker Res., LLC, 1 (Dec. 16, 2016, 10:34 am).

[67] Id., E-mail from Gary Raker, Raker Res., LLC, to Justin Crooks, Cont'l Res., Inc., 1 (Dec. 16, 2016, 9:11:42 PM +0000).

[68] Id., Jt. Trial Ex. 83, E-mail from Justin Crooks, Cont'l Res., Inc., to Gary Raker, Raker Res., LLC, 1 (Dec. 21, 2016, 6:56 PM).

[69] Id., Jt. Trial Ex. 34, Well Location Plat 1; id., Jt. Trial Ex. 66, Cont'l Res., Inc. Location Report 1; ROA p.000596, Trial Tr. vol. II, 203:25--204:11 (testimony of Justin Crooks).

[70] ROA p.000595, Trial Tr. vol. I, 71:10--:20 (testimony of David Cowan). See generally 52 O.S.2021, § 318.3 ("Before entering upon a site for oil or gas drilling, except in [certain] instances [not applicable here] . . . , the operator shall give to the surface owner a written notice of his intent to drill containing a designation of the proposed location and the approximate date that the operator proposes to commence drilling. Such notice shall be given to the surface owner in any manner as provided for in paragraph 1 and paragraph 2 of subsection C of Section 2004 of Title 12 of the Oklahoma Statutes for the service by personal delivery or by mail of a summons in a civil action. . . . Within five (5) days of the date of delivery or service of the notice of intent to drill, it shall be the duty of the operator and the surface owner to enter into good faith negotiations to determine the surface damages."); id. § 318.5(A) ("Prior to entering the site with heavy equipment, the operator shall negotiate with the surface owner for the payment of any damages which may be caused by the drilling operation. . . .").

[71] ROA p.000595, Trial Tr. vol. I, 71:20--:25 (testimony of David Cowan).

[72] See id., Trial Tr. vol. I, 72:1--:4, 77:10--78:1; Cont'l Res., Inc. v. Tres C, L.L.C., No. CJ-2017-0003 (Blaine Cty. Dist. Ct. filed Jan. 17, 2017). See generally 52 O.S.2021, § 318.5(A) (" . . . If the parties agree, and a written contract is signed, the operator may enter the site to drill. If agreement is not reached, . . . the operator shall petition the district court in the county in which the drilling site is located for appointment of appraisers to make recommendations to the parties and to the court concerning the amount of damages, if any. Once the operator has petitioned for appointment of appraisers, the operator may enter the site to drill.").

[73] ROA p.000595, Trial Tr. vol. I, 78:2--:6 (testimony of David Cowan); ROA p.000598, Jt. Trial Ex. 62, Surface Use Agreement (dated May 25, 2017, and executed by Tincy Cowan on June 12, 2017).

[74] ROA p.000598, Jt. Trial Ex. 36, Cont'l Res., Inc. Auth. for Expenditure 1--2.

[75] Id., Jt. Trial Ex. 42, Appl. 1, In re Appl. of Cont'l Res., Inc. for Multiunit Horizontal Well, Cause CD No. 201700062 (Okla. Corp. Comm'n filed Jan. 6, 2017); id., Jt. Trial Ex. 38B, Appl. 1, In re Appl. of Cont'l Res., Inc. for Well Location Exception, Cause CD No. 201700063 (Okla. Corp. Comm'n filed Jan. 6, 2017); id., Jt. Trial Ex. 43, Appl. 1, In re Appl. of Cont'l Res., Inc. for Well Location Exception, Cause CD No. 201700064 (Okla. Corp. Comm'n filed Jan. 6, 2017).

[76] Id., Jt. Trial Ex. 40, Notice of Hr'g 1--2, In re Appl. of Cont'l Res., Inc. for Multiunit Horizontal Well, Cause CD No. 201700062 (Okla. Corp. Comm'n Jan. 6, 2017); id., Jt. Trial Ex. 41, Notice of Hr'g 1--2, In re Appl. of Cont'l Res., Inc. for Well Location Exception, Cause CD No. 201700063 (Okla. Corp. Comm'n Jan. 6, 2017).

[77] Id., Jt. Trial Ex. 66, Cont'l Res., Inc. Location Report 1; ROA p.000596, Trial Tr. vol. II, 203:25--204:4, 204:12--:16 (testimony of Justin Crooks); ROA pp.000574, 000577, Journal Entry of J. ¶¶ 7, 32, at 2, 5.

[78] ROA p.000598, Jt. Trial Ex. 51, Entry of Appearance & Notice of Protest 1, In re Appl. of Cont'l Res., Inc. for Multiunit Horizontal Well, Cause CD No. 201700062 (Okla. Corp. Comm'n filed Jan. 27, 2017); id., Jt. Trial Ex. 50, Entry of Appearance & Notice of Protest 1, In re Appl. of Cont'l Res., Inc. for Well Location Exception, Cause CD No. 201700063 (Okla. Corp. Comm'n filed Jan. 27, 2017); id., Jt. Trial Ex. 52, Entry of Appearance & Notice of Protest 1, In re Appl. of Cont'l Res., Inc. for Well Location Exception, Cause CD No. 201700064 (Okla. Corp. Comm'n filed Jan. 27, 2017).

[79] See, e.g., id., Jt. Trial Ex. 59, Emergency Order ¶ 3, at 1, In re Appl. of Cont'l Res., Inc. for Multiunit Horizontal Well, Cause CD No. 201700062 (Okla. Corp. Comm'n Mar. 9, 2017).

[80] Id., Jt. Trial Ex. 54, Appl. for Emergency Order ¶ 2, at 1, In re Appl. of Cont'l Res., Inc. for Multiunit Horizontal Well, Cause CD No. 201700062 (Okla. Corp. Comm'n filed Feb. 3, 2017); id., Jt. Trial Ex. 56, Appl. for Emergency Order ¶ 2, at 2, In re Appl. of Cont'l Res., Inc. for Well Location Exception, Cause CD No. 201700063 (Okla. Corp. Comm'n filed Jan. 6, 2017).

[81] Id., Jt. Trial Ex. 59, Emergency Order 1--2, In re Appl. of Cont'l Res., Inc. for Multiunit Horizontal Well, Cause CD No. 201700062 (Okla. Corp. Comm'n Mar. 9, 2017); id., Jt. Trial Ex. 60, Emergency Order 2, In re Appl. of Cont'l Res., Inc. for Well Location Exception, Cause CD No. 20170063 (Okla. Corp. Comm'n Mar. 9, 2017).

[82] ROA p.000596, Trial Tr. vol. II, 214:9--:15 (testimony of Justin Crooks).

[83] ROA p.000598, Jt. Trial Ex. 57, Permit to Drill 1.

[84] Id., Jt. Trial Ex. 65A, Okla. Corp. Comm'n Completion Report 1; id., Jt. Trial Ex. 36, Cont'l Res., Inc. Auth. for Expenditure 3 (showing Continental Resources' authorization on February 23rd to spend $9,397,169 towards completion of the multiunit Tres C Well); ROA p.000596, Trial Tr. vol. II, 215:25--216:7, 217:19--218:3 (testimony of Justin Crooks).

[85] ROA p.000001, Pet. 1.

[86] ROA pp.000001--000002, Pet. ¶¶ 5, 7, at 1--2.

[87] ROA p.000595, Trial Tr. vol. I, 48:21--50:8 (testimony of Tincy Cowan); id. at 72:18--:25 (testimony of David Cowan).

[88] Id. at 197:1--:3 (testimony of Aaron Anderson).

[89] Id. at 152:1--:15, 173:13--:23.

[90] ROA p.000596, Trial Tr. vol. II, 43:19--46:24, 163:5--164:5 (testimony of Matthew Simmons).

[91] Id. at 80:15--81:13, 83:2--:8, 94:9--19, 101:21--106:5, 108:9--109:16, 111:11--112:9 (testimony of Gary Raker); see also id. at 142:24--143:17 (testifying that, based on his experience, a reasonable operator would not have abandoned the Cowan Well in October, November, December, or January).

[92] See id. at 223:13--225:11, 229:9--:23 (testimony of Justin Crooks).

[93] See id. at 266:14--:19, 267:9--:13, 273:7--274:16 (testimony of J.P. Dick); ROA p.000597, Trial Tr. vol. III, 18:18--19:25 (testimony of J.P. Dick).

[94] See ROA p.000596, Trial Tr. vol. II, 274:14--277:24 (testimony of J.P. Dick).

[95] See ROA p.000597, Trial Tr. vol. III, 73:3--:13 (testimony of J.P. Dick).

[96] ROA p.000596, Trial Tr. vol. II, 278:8--280:23 (testimony of J.P. Dick); ROA p.000597, Trial Tr. vol. III, 18:18--19:25, 21:17--22:8 (testimony of J.P. Dick).

[97] ROA p.000597, Trial Tr. vol. III, 51:22--55:6 (testimony of J.P. Dick).

[98] Id. at 72:11--73:2.

[99] See generally ROA p.000596, Trial Tr. vol. II, 191:9--219:10 (testimony of Justin Crooks).

[100] ROA p.000576, Journal Entry of J. ¶¶ 21--24, at 4.

[101] Id. at p.000575, Journal Entry of J. ¶ 15, at 3.

[102] Id. at pp.000575--000577, Journal Entry of J. ¶¶ 16--20, 26--27, at 3--5.

[103] Id. at p.000577, Journal Entry of J. ¶¶ 28--29, at 5.

[104] Id., Journal Entry of J. ¶¶ 31--34, at 5; see also id. at p.000574, Journal Entry of J. ¶ 7, at 2 ("Continental commenced operations for the drilling of the well in January, 2017.").

[105] Id. at p.000577, Journal Entry of J. ¶ 34, at 5.

[106] Id., Journal Entry of J. ¶ 36, at 5.

[107] Pet. in Error 1--2, Feb. 14, 2020.

[108] Compare Pet. in Error ex. C (listing five issues to be raised on appeal, including the trial court's alleged error in not considering Continental Resources' preparatory acts to drill the new Tres C Well occurring prior to January 19, 2017, as well as the trial court's alleged error in counting compressor expenses and low-volume fees as "lifting costs"), with Appellants' Br. 13--14 (only listing the two issues discussed infra).

[109] Appellants' Br. 15 (quoting the ALL CAPS text of the heading, but removing the ALL CAPS formatting).

[110] Id. at 13--14.

[111] Id. at 14, 26--28.

[112] Id. at 14.

[113] Order 1, Mar. 6, 2020 (denying Defendants/Petitioners' motion to retain); Order Sheet 1, Dec 9, 2020 (assigning this and other appeals to the COCA).

[114] COCA's Op. 2, 4, 8--9 (unpublished).

[115] Id. at 11.

[116] Id.

[117] Appellants' Pet. for Writ of Cert. 1.

[118] See id. at 1--3.

[119] Id. at 5--6.

[120] Id. at 5; see also id. at 1, 6--10 & n.1 (citing and quoting Hall, 2018 OK 59, 427 P.3d 1052; Pack, 1994 OK 23, 869 P.2d 323; Stewart, 1979 OK 145, 604 P.2d 854).

[121] Id. at 5; see also id. at 1--2, 6--8 & n.3 (citing and quoting 2 Eugene Kuntz, A Treatise on the Law of Oil and Gas §§ 26.6, 26.7(u), 26.13(b) (1990 & Supp. 2021); 4 Eugene Kuntz, A Treatise on the Law of Oil and Gas § 47.3(a)(1) (Supp. 2021)).

[122] See id. at 1, 8 & n.2.

[123] Appellee's Resp. to Appellants' Pet. for Writ of Cert. 1, 5; Appellee's Answer Br. 8.

[124] Appellee's Resp. to Appellants' Pet. for Writ of Cert. 1--4 (citing and quoting Hall, 2018 OK 59, 427 P.3d 1052; French, 1986 OK 22, 725 P.2d 275; Hoyt, 1980 OK 1, 606 P.2d 560); Appellee's Answer Br. 8--16.

[125] Appellee's Resp. to Appellants' Pet. for Writ of Cert. 5, 8 (citing Pack, 1994 OK 23, 869 P.2d at 327; Blair, 2017 OK CIV APP 57, 406 P.3d 580).

[126] Id. at 9.

[127] Title 12, section 100 of the Oklahoma Statutes provides as follows:

If any action is commenced within due time, and a judgment thereon for the plaintiff is reversed, or if the plaintiff fail in such action otherwise than upon the merits, the plaintiff . . . may commence a new action within one (1) year after the reversal or failure although the time limit for commencing the action shall have expired before the new action is filed.

12 O.S.2011, § 100 (emphasis added)).

[128] See supra note 5 and accompanying text (emphasis added).

[129] See supra notes 32 through 41 and accompanying text.

[130] See supra notes 101--102 and accompanying text.

[131] See supra notes 32 through 41 and accompanying text.

[132] See supra notes 101 and accompanying text.

 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
2023 OK 90, 
OIL VALLEY PETROLEUM v. MOORE
Discussed at Length

 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Civil Appeals Cases

 
Cite
Name
Level

 
2017 OK CIV APP 57, 406 P.3d 580, 
BLAIR v. NATURAL GAS ANADARKO COMPANY
Discussed at Length

Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
1987 OK 26, 738 P.2d 137, 58 OBJ 1403, 
Hininger v. Kaiser
Discussed

 
1994 OK 23, 869 P.2d 323, 65 OBJ 803, 
Pack v. Santa Fe Minerals
Discussed at Length

 
1954 OK 170, 274 P.2d 545, 
HENRY v. CLAY
Discussed at Length

 
1958 OK 208, 330 P.2d 217, 
COTNER v. WARREN
Discussed

 
1959 OK 23, 338 P.2d 872, 
JONES v. MOORE
Discussed

 
1966 OK 168, 418 P.2d 620, 
BRIGGS v. SARKEYS, INC.
Discussed

 
2004 OK 10, 85 P.3d 830, 
SMITH v. MARSHALL OIL CORPORATION
Discussed at Length

 
1996 OK 13, 911 P.2d 1205, 67 OBJ 529, 
Voiles v. Santa Fe Minerals, Inc.
Discussed

 
1980 OK 1, 606 P.2d 560, 
Hoyt v. Continental Oil Co.
Discussed at Length

 
1979 OK 145, 604 P.2d 854, 
STEWART v. AMERADA HESS CORP.
Discussed at Length

 
2018 OK 59, 427 P.3d 1052, 
HALL v. GALMOR
Discussed at Length

 
1982 OK 49, 648 P.2d 14, 
Barby v. Singer
Discussed at Length

 
1999 OK 68, 990 P.2d 235, 70 OBJ 2226, 
State ex. rel. Dept. of Human Services v. Baggett
Discussed

 
1986 OK 22, 725 P.2d 275, 58 OBJ 2885, 
French v. Tenneco Oil Co.
Discussed at Length

Title 12. Civil Procedure

 
Cite
Name
Level

 
12 O.S. 100, 
Limitation of New Action after Reversal or Failure Otherwise than on Merits
Discussed

Title 23. Damages

 
Cite
Name
Level

 
23 O.S. 2, 
Relief from Forfeiture - Exception
Cited

Title 52. Oil and Gas

 
Cite
Name
Level

 
52 O.S. 318.3, 
Notice of Intent to Drill - Negotiating Surface Damages
Cited

 
52 O.S. 318.5, 
Negotiating Surface Damages - Appraisers - Report and Exceptions Thereto - Jury Trial
Cited

 
 

 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA